UNITED STATES of America

v.

Robert Felix GONZALEZ.

UNITED STATES of America

v.

Alejandro BATRIZ.

UNITED STATES of America

v.

Reynaldo LANDEROS–RODARTE.

UNITED STATES of America

v.

Antonio BEJARANO.

Nos. CR 74–133, CR 74–139, CR 74–152 and 74–153.

United States District Court, D. Oregon.

Oct. 29, 1974.

---

Richard W. Courtright, Medford, Or., for defendant Gonzalez.

Tom Schneiger, Fed. Public Defender, Portland, Or., for defendant Batriz.

Thomas W. Kolberg, Roseburg, Or., for defendants Bejarano and Landeros-Rodarte.

Asst. U. S. Atty. Vic Stone, for the U. S.

BURNS, District Judge.

I am called upon today to sentence four men charged with violating the immigration laws of the United States.[1] Because it is important—even vital—for judges to describe publicly the reasons for sentences they impose, I set forth my understanding of the situation in which these cases arose and the purposes I hope to serve by my sentencing decision.[2] My remarks are more exten-

---

1. While virtually all which follows was delivered orally at the time of sentencing, footnotes have been added, and these remarks have been edited slightly for publication. The specific offenses of each defendant are set out at the end of the opinion.

2. During an earlier hearing, at which I postponed sentencing to today, I asked the government to obtain the views of the Immigration and Naturalization Service (INS) and the Forest Service. Letters setting forth these views have been sent in. In addition,

sive than usual, but trafficking in illegal aliens presents so pervasive and powerful a pattern of lawbreaking, as well as social and economic problems of such magnitude, that broad consideration is appropriate.[3] It is important to understand not only the nature of the problems, but also the proper role of the criminal justice system in their solution. In these cases, even more than most, judges do not sentence in a vacuum.

## I. THE PROBLEM IN NUMBERS

According to the Immigration and Naturalization Service, the federal agency charged with enforcement of the immigration laws, about ten thousand aliens are illegally living and working in the State of Oregon. Most of them are Mexicans. Of course no census has been taken, but investigators estimate that between seven and ten illegal aliens escape detection and arrest for each one who is apprehended. Thus the 860 arrests in the first six months of this year suggest that between 9,000 and 17,000 illegals are presently in Oregon. This state is, to be sure, only one of many with substantial illegal populations. For the nation as a whole, the Immigration and Naturalization Service estimates 10 million illegals, and that number shows no signs of diminishing. Indeed, the Service projects an increase of 1 million per year.

## II. THE PROBLEM IN HUMAN TERMS

Illegal aliens, such as those employed and harbored by defendants here, present a human drama whose motifs are deception, greed, danger, and exploitation. Faced with chronically high unemployment and comparatively low wages in his native land, the young and physically able Mexican slips across the border in search of work, fortified by a $300 grubstake, usually supplied by a loan shark at usurious rates. Forged identification and false papers, as well as transportation, are provided by mandacious middlemen for the labor contractor like defendant Gonzales. The labor contractor, in turn, has been the winning bidder on a fruit picking contract or a reforestation job for public agencies such as the Forest Service or the Bureau of Land Management, or for the private forest industry. He wins his bids because he can pay the illegals less than he would pay legal workers. If the illegal complains, INS can be tipped off, and the troublesome employee deported; replacements are easily available, with their compliance insured by their illegal status. The enormity of the human misery is apparent.

## III. WHAT ARE THE HARMS?

One may ask why we are troubled. If the fruit gets picked and the trees get planted, and if persons who would earn next to nothing in Mexico are able to earn at least something here, what harm is done? The harms are many and real.

First, plainly, the law is being violated. The people of this country, through their Congress, have determined by law a policy and a procedure to govern immigration into the United States.[4] This law should be enforced. Both the immigration law in particular and the law in general are brought into gradually disabling disrespect by flagrant and virtually unopposed violation.

Second, the citizens of Oregon and the country at large are harmed by this great invasion (even though we do not know how many illegals are employed). September figures show 55,600 persons unemployed in Oregon. Although no one-for-one match is possible, it is safe to say that many of the jobs held by aliens illegally in the state would go to persons now unemployed if the laws were strictly enforced. Several thousand new jobs, productive work for

---

I requested and received added factual material from INS, some of which is discussed in this statement.

3. See, e. g., Speech of Attorney General William Saxbe, 16 Cr.L. 2158, November 20, 1974.

4. 8 U.S.C. Ch. 12 and 18 U.S.C. Ch. 69.

those now forced to be idle, would be a major reduction in the state's unemployment. Nationally, 5.2 million citizens were unemployed in September, at a time when roughly 10 million persons were illegally within our borders. Additional burdens from this illegal influx show up in higher costs for social services: schools, housing, welfare, and particularly law enforcement. Tax revenues are also lost when transient aliens either do not pay taxes or fraudulently claim dependent deductions.

Third, the workers are contemptuously exploited by those who hire them. Many of the dollars their labor earns are squeezed from them. Their debts to contractors, forgers, transporters, harborers, and concealers force them into a kind of peonage. Whether the exploiters act directly or merely by knowingly tolerating illegality, whether they be labor contractors, fruit growers, vegetable farmers, lumber companies, or even the Forest Service itself, all gain from the lower wages they can pay to illegals.

## IV. RESOURCES FOR ENFORCEMENT

To cope with illegal aliens in Oregon, the District Director of the Immigration and Naturalization Service has available between 50 and 60% of the working time of two criminal investigators. That much manpower is almost mockingly insufficient. Each month the District Office receives about 600 leads, tips, calls, complaints, and letters about illegal aliens; in September, none were followed up because neither staff nor money were available. When two investigators recently planned a trip to the southern part of the state in connection with the cases being decided here, the District Director had to make a special appeal for additional travel money because his monthly travel account had only $28 left in it. Similarly, the United States Attorney for the District of Oregon has limited resources he can commit to investigation and prosecution of immigration law violations.

In connection with the trip just mentioned, I am advised that it was only because the District Director of INS went on bended knee to the Regional Director that he was able to secure the pitiful sum of $75 as added travel money and so make it possible for the INS inspectors to make the trip with a probation officer. Significantly, that trip tends to show that some of these defendants have continued to flaunt the law by their employment practices.

## V. THE CRIMINAL JUSTICE SYSTEM

In this context, what role can the criminal justice system properly play? It is obvious that it makes little sense to try to round up and imprison 10,000 illegal aliens: hundreds of policemen, scores of prosecutors, and dozens of prisons (or transport vans back to the border) would be required. But it may not be inappropriate for me to speak to some alternative approaches and partial solutions. Better mechanisms, ones more cost-effective, less blunt, and more flexible than the criminal justice system ought to be adopted. Government agencies contracting for labor should be encouraged, wherever possible, to make it a condition of the contract that knowing use of illegals will be grounds for termination of the contract. Private corporations should make similar arrangements. Statutory changes, like those in Congressman Rodino's bill may impose stiff and escalating fines on those who knowingly hire illegal aliens.[5] The Congress ought to respond to the request by INS for more dollars to increase enforcement personnel. If Congress is unwilling to do this—whether in response to a call for a halt to federal spending, or otherwise—then it ought to consider substantive legislative changes. By maintaining the status quo, Congress, in effect, gives an appropriations teacup to INS, with directions that it must use it alone to empty the ocean of illegal immigration.

5. H.R. 982, 93rd Cong., 1st Sess. (1973).

But until these devices begin to work, I do not believe the criminal law can abdicate its responsibility simply because the problem is massive and complex, because enforcement is necessarily not universal, and because progress is halting and real relief a long way down the road. Furthermore, even when better mechanisms exist, the criminal law will have an important secondary function in supporting and encouraging compliance with immigration policy as established by statute.

■ I impose sentence today primarily for the general deterrent effect I hope the penalties will have on others. Among the accepted functions of sentencing in criminal cases—social protection by isolation of the offender, rehabilitation through treatment and training, retribution or the expression of community disapproval of law-breaking, specific deterrence by effect upon the individual offender, and general deterrence by effect upon others—the last is most controversial.[6]

Scholarly skeptics and common-speaking cynics alike offer up examples to prove that sentences do not deter, but these examples are almost always addressed to a general question that frequently is not answerable or often not even useful. The question here is whether punishment of *these* defendants, in *this* court, on *these* charges will, if well-publicized, deter others in *this* state from encouraging and aiding illegal aliens. Even though few may be charged and convicted, many will understand that if caught, they face stiff sentences. I think that a goodly number will choose to live up to the law rather than run the risk involved in future violations of the law.

These defendants before me this morning did not, of course, invent the use of illegal aliens. In comparative terms they have probably used but a tiny percentage of those presently in the state. These defendants are not the ultimate beneficiaries of these practices in the sense that the Forest Service or the orchardist is. Indeed, we may say that each of us who consumes those goods and services tends to benefit when the use of illegals drives down the cost of production. But these defendants are the ones I am called upon to sentence here today. And each of us must understand that strict enforcement of these laws will increase the costs of those goods and services. I doubt, however, that the people as a whole, or Congress as their representatives, would knowingly exchange wholesale law-breaking and human misery for cheaper pears or lower cost lumber.

It is obvious from what I have said that this case cries out for the application of the principle of general deterrence. In addition, while the evidence is mixed as to any repetition of criminal behavior by these defendants in continuing to employ illegals after they entered guilty pleas, I am satisfied that probation or a light jail sentence would be inadequate for appropriate specific deterring effect on these individuals.

■ With respect to Defendant Gonzales, his presentence report shows that he has on his prior record an NSF check in 1969 for which he received one year's probation; criminal activity in drugs in 1972 for which he received two years' state probation; and a criminal activity in drugs in 1972 for which he received a $250 fine. He has entered a plea to three counts of the information: Count I (interstate transportation of a firearm) carrying a maximum sentence of two years, or $10,000 fine, or both, Count XII (knowingly causing an illegal alien to be transported), and XIII (wilfully concealing or harboring an alien), each carrying five years, or $2,000 fine, or both.[7] For the reasons indicated, I

---

6. See generally, F. Zimring and G. Hawkins, Deterrence (1973).

7. Respectively, 18 U.S.C. (App.) § 1202(a)(1); 8 U.S.C. § 1324(a)(2) and 18 U.S.C. § 2; 8 U.S.C. § 1324(a)(3) and 18 U.S.C. § 2.

impose sentence of two years and a fine of $7,500 on Count I. I impose a sentence of two years and a fine of $2,000 on Count XII, consecutive to the sentence on Count I. On Count XIII, I impose a sentence of two years, which will be suspended; upon defendant's release from custody, he will be placed on probation for five years, with a special condition that he pay a fine of $2,000. Thus, the total penalty is four years imprisonment, $11,500 in fines, and five years on probation.

 Defendant Bejarano entered a plea to Count IV (aiding and procuring the false making of an alien registration receipt card) of the information carrying a maximum of five years, or $5,000, or both.[8] Although he is legally eligible for the Youth Corrections Act, I am satisfied that he will not benefit by its provisions, and I reject its application.[9] Though he has no prior criminal record, nonetheless, for the reasons indicated, I impose a sentence of three years and a fine of $2,000.

Defendant Landeros has entered a plea to Counts I and II (each charging him with knowingly causing to be transported an illegal alien.[10] Each count carries a maximum of five years, or $2,000 fine, or both. He too is eligible for YCA treatment, which I reject for the same reasons previously mentioned. I impose a sentence of two and one-half years and a fine of $1,000 on Count I, and a sentence of two and one-half years, suspended, on Count II. Upon release from custody, he will be placed on probation for five years, with a special condition that he pay a fine of $1,000.

Defendant Batriz entered a plea of guilty to Count I (knowing transportation of an illegal alien).[11] I impose a sentence of three years. Since he is in custody on state charges, I recommend

that the Bureau of Prisons designate the Oregon Corrections Division as custodian, so that he can serve his federal sentence concurrently with his state sentence.