Michael G. BRESGAL, et al., Plaintiffs,

v.

William BROCK, Secretary of Labor Designate, Defendant.

Civ. No. 84–6315–E.

United States District Court,
D. Oregon.

Oct. 1, 1985.

See also 637 F.Supp. 278, 637 F.Supp. 280.

James M. Campbell, Goldstein & Campbell, Eugene, Or., for plaintiffs.

272

Linda Lance, U.S. Dept. of Justice, Washington, D.C., for defendant.

Mary Lewis, Oregon Legal Services Corp., Woodburn, Or., for intervenors.

## OPINION AND ORDER

JAMES M. BURNS, District Judge.

In this straightforward case, the court is called upon to define the term "agricultural employment" as it appears in the Migrant and Seasonal Agricultural Worker Protection Act (MSPA) 29 U.S.C. § 1802(3). The precise issue presented is whether workers who engage in forestry work, such as planting, clearing brush, and the like, are engaged in "agricultural employment" so as to make applicable the remedial provisions of the Act regulating labor contractors in that area. All parties agree the question is purely one of law, and therefore appropriate for resolution on summary judgment.

### I. Motion to Intervene

Plaintiffs represent themselves to be residents of Lane County, Oregon who find employment as forestry workers on a seasonal or temporary basis. This work requires their overnight absence from home. Also suing as a plaintiff is the Northwest Forest Workers Association, a trade association of forestry workers, based in Eugene, having several members who perform migratory labor in forestry.

Proposed intervenors are Augustin Villegas, Rene Guerrero, and Jose Ponce, three individuals who describe themselves as migratory farmworkers who have previously found temporary work in forestry here in Oregon; they are permanent residents of other states. The intervenors have provided detailed affidavits in connection with their motion for leave to intervene. The affidavits describe specific instances of fraud, overreaching, and abuse suffered by intervenors at the hands of labor contractors who recruited the intervenors for various forestry jobs.

Plaintiffs have no objection to the proposed intervention. The defendants objected, initially on procedural grounds concerning disruption of the briefing schedule and so on. Yet defendants have been provided with ample opportunity to respond to all of the arguments and facts advanced by intervenors, and they have done so. There is no prejudice to any party in the proposed intervention, and no valid procedural ground for denial of the request. *See United States v. State of Oregon,* 745 F.2d 550, 552 (9th Cir.1984).[1]

■ As to the legal standards for intervention under Fed.R.Civ.P. 24, these have been satisfied whether the intervention is by right or by permission. As migratory workers who have worked through labor contractors in Oregon and elsewhere, and who will likely do so again, intervenors have a concrete interest in the outcome of this litigation. The litigation will surely affect their ability to protect that interest as a practical matter. Finally, although plaintiffs are represented by competent counsel, their interest may not be identical with that of intervenors, especially if the intervenors' interests are excluded from any potential settlement discussions.[2] The Ninth Circuit has generally endorsed "liberal construction in favor of applications for intervention." *Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d 525, 527 (9th Cir. 1983); *Washington State Building & Construction Trades v. Spellman,* 684 F.2d 627 (9th Cir.1982). Intervenors bring a valuable factual perspective to this litiga-

1. Defendants subsequently filed a memorandum opposing intervention on the ground that intervenors' interests were adequately protected by plaintiffs. They alternatively argued that if their interests were different, and if plaintiffs lacked standing, the entire action should be dismissed. These arguments are unpersuasive and invite the court to become enmeshed in needless quasi-factual disputes regarding standing that are completely beside the point of this action.

2. Intervenors suggested, in rather vague tones, the possibility of the Secretary agreeing to take actions which might satisfy the demands of some of the plaintiffs without formally agreeing to enforce MSPA.

tion; they have supplied detailed evidence in support of plaintiffs' summary judgment motion, of a type that was previously lacking. Thus, intervention under Rule 24(a) seems proper, and in any event is allowable under Rule 24(b). The motion to intervene is granted.

## II. Cross Motions for Summary Judgment

■ As mentioned above, the sole issue before the court is whether forestry work is encompassed within the term "agricultural employment" as that term is set out in 29 U.S.C. § 1802(3). It is a maxim of statutory construction that a court should first look to the literal wording of a statute; resort to legislative history is usually undertaken only where there is ambiguity or conflict in applying the statutory language at issue. *See, e.g., Green v. Commissioner of Internal Revenue,* 707 F.2d 404, 405 (9th Cir.1983).[3]

■ In the instant case, the statute defines "agricultural employment" as

(E)mployment in any service or activity included within the provisions of section 3(f) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(f), or section 3121(g) of Title 26 and the handling, planting,

drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state.

29 U.S.C. § 1802(3). The parties (and the court) are in agreement that forestry is not within section 3(f) of the FLSA or within section 3121(g) of the Internal Revenue Code, 26 U.S.C. § 3121(g).[4] However, such forestry activities such as the planting of seedlings and related work could literally come within the terms of this definition as the "handling or planting of an agricultural or horticultural commodity," as those terms are used in ordinary parlance.[5] However, forestry work has never been included within the more narrow definitions of "agricultural employment" contained in the FLSA or IRC provisions incorporated into 29 U.S.C. § 1802(3). There is, therefore, an ambiguity, or conflict on the face of the statute. It is thus proper to look to the legislative history for assistance in divining Congressional intent, which is the ultimate goal for the court. *Trailer Train Co. v. State Board of Equalization,* 697 F.2d 860 (9th Cir.1983).

### A. Legislative History

Federal regulation of contractors who supply workers to agricultural employers

---

**3.** The court fully recognizes that "canons of construction" are not fixed and immutable rules of law, but are "merely guideposts in discerning Congressional intent." *Busic v. United States,* 446 U.S. 398, 406–07, 100 S.Ct. 1747, 1752–53, 64 L.Ed.2d 381 (1980); *Blackfeet Tribe of Indians v. State of Montana,* 729 F.2d 1192, 1201 (9th Cir. 1984). Thus, it may even be appropriate to consult legislative history where the statutory language seems clear on its face, if such a step is taken "cautiously." *See Tualip Tribes of Washington v. Federal Energy Regulatory Commission,* 732 F.2d 1451, 1454 (9th Cir.1984). Nonetheless, because the construction urged by the Secretary is derived from two entirely different statutory schemes (the Fair Labor Standards Act and Internal Revenue Code), and because the interpretation is somewhat at odds with the normal, plain meaning of the statutory language, I conclude that resort to the legislative history is entirely appropriate here. Indeed, the Ninth Circuit has endorsed such an approach in cases of first impression, such as this one. *See Turner v. Prod,* 707 F.2d 1109, 1114 (9th Cir.1983). The Ninth Circuit's flexible

approach in this area may be a remote, lineal descendant of the view espoused by Chief Justice Marshall, who suggested: "Where the mind labors to discover the design of the legislature it seizes everything from which aid can be derived." *United States v. Fisher,* 2 Cranch 358, 386, 2 L.Ed. 304, 313 (1805).

**4.** Those sections have been quoted at length in the moving papers and it is unnecessary to set them out in full here. It should be noted, as discussed *infra,* that those other statutes arose in an entirely different historical context and served different purposes than the MSPA definition at issue in this case.

**5.** For example, in Webster's Third New International Dictionary (1966), the definition of "agriculture" includes: "The science or art of the production of plants and animals useful to man and in varying degrees the preparation of these products for man's use and their disposal (as by marketing)." Certainly the growing of trees as "plants useful to man" would fit within this commonplace definition.

began with the Farm Labor Contractors Registration Act (FLCRA) of 1963, Pub.L. 88–582, 78 Stat. 920 (1964). This law attempted to control some of the more flagrant abuses of migrant workers by labor contractors. Section 4 of that Act required labor contractors to register with the Secretary of Labor. Registered contractors were required to carry liability insurance (§ 5(a)), disclose the conditions of employment and housing (§ 6), and comply with other regulations and laws. The coverage of the 1963 Act was limited in many ways, however. It governed only "agricultural employment" as defined in the FLSA and IRC, and it only covered workers transported interstate.

By 1974, it became clear to Congress that the earlier law had not fully achieved its purposes. Among other problems, the earlier law could not be effectively enforced, violations were insubstantial, no private remedies were provided for victims, and inadequate resources were allocated to administer the law. *See* S.Rep. No. 93–1295, 93rd Cong.2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad.News 6441, 6443.

In considering revisions to improve the effectiveness of the regulatory scheme, Congress received much evidence, both in testimony before the various subcommittees involved, and in the form of documents submitted by concerned participants in the industry. This testimony graphically documented the exploitation of migrant workers by unlicensed labor contractors. For example, a principal complaint was that contractors refused to disclose the wages to be paid, or grossly exaggerated the compensation to be paid. *See Farm Labor Contractor Registration Act Amendments of 1973: Hearings on H.R. 7597 Before the Subcomm. on Agricultural Labor of the Committee on Education and Labor*, 93rd Cong. 1st Sess., pp. 190–91 (1973); *Farm Labor Contractor Registration Act Amendments 1974: Hearings on S.2070, Subcomm. on Labor and Public Welfare*, 93rd Cong.2d Sess. pp. 40–44, 65, 102–103, 109 (1974). Other witnesses described practices of unexplained deductions made from wages, misrepresentations about living conditions, or the amount of work that was actually available. *Id.*, pp. 224–227.

To broaden the protection available to migrant workers, the 1974 revisions added several remedial measures. Coverage was extended to intrastate activities, contractors were required to carry more substantial liability insurance, and perhaps more important, contractors were required to disclose in more detail (and in writing) the terms and conditions of employment at the outset. Civil remedies for aggrieved persons were added, and criminal sanctions were strengthened. *See* S.R. 93–1295, 93rd Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 6446 (1974). Also, upon the urging of some witnesses to "include all recruiters," *Senate Hearings on S. 2070, supra*, P. 220, Congress expanded the definition of "agricultural employment" in Section 3(f) of the Act. In *addition* to covering those activities defined by the FLSA and the IRC, as under the 1963 Act, the new law further covered:

> ... the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state.

29 U.S.C. § 1802(3). The precise question facing the court is the intended scope of the added language.

Obviously, one effect of this new language is to extend coverage "vertically" [6]

---

6. The Secretary's memoranda in this court showed some confusion over the use of the terms "horizontally" and "vertically" in this context. Borrowing these terms of art from the antitrust field, "vertical" expansion or integration usually refers to the various steps in producing and marketing a particular type of commodity, while "horizontal" activities, such as mergers, usually relate to completely different products or areas of commerce. Thus, an oil refinery becomes "vertically" integrated when it buys oil wells and a chain of distribution outlets. The same company would be said to expand "horizontally" if it bought a computer company. *See, e.g.,* III P. Areeda and D. Turner, *Antitrust Law* § 723 (1978). Of course, while it

within the industry, to cover all steps in the production chain of products previously covered under the FLSA and IRC definitions. Thus, while the 1963 Act may clearly have covered contractors supplying labor to pick tomatoes, for example, the new language would also reach contractors supplying migrant labor to the tomato cannery. The real issue here is whether the new language expanded coverage horizontally as well, to growing operations not previously covered, such as forestry.

The testimony before the subcommittees working on the 1974 Act contains no reference to forestry work in particular. However, one statement appears in Senate Report 93–1295, which accompanied S. 3202, the version that was ultimately enacted, which seems to address this question head-on.

> The Committee has been informed by the Commissioner of the Immigration and Naturalization Service that some government agencies have permitted the employment of illegal aliens as tree planters, thinners, and other forest laborers by awarding contracts to forestry contractors who regularly employ aliens who have illegally entered the United States. *The provisions of this bill are intended to apply to such contractors.*

S.R. 93–1295, 93rd Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 6446 (1974) (emphasis added). Naturally, the parties take differing positions as to the significance of the quoted language.

### B. Application to the Present Case

The Secretary's principal argument against finding a horizontal expansion in the 1974 amendment lies in his narrow and rigorous definition of the term "agricultural or horticultural commodity." As explained in the Secretary's motion for summary judgment, those words have a venerable history in other statutes and regulations dating back as far as 1947. In its administration of the Fair Labor Standards Act, the Secretary published regulations at 12 Fed.Reg. 5961, 29 C.F.R. 780.62 (1947) specifically excluding forestry from the term "agriculture" unless the work was performed by a farmer or on a farm, incidental to the farm's operations. That rule is presently found in 29 C.F.R. 780.115 (1984) and states that "Trees grown in forests and the lumber derived therefrom are not 'agricultural or horticultural commodities.'" *Id.* The Secretary points out that this history of administrative construction of the term "agricultural and horticultural commodity" was, in effect, ratified and adopted by Congress as part of its definition of "agricultural employment" in the FLCRA amendments in 1974. There are subtle problems with this argument.

First, the principal features of the Fair Labor Standards Act are the establishment of minimum wages, overtime pay, and equal pay.[7] From this remedial thrust, Congress provided an exception in Section 3(f) of the Act for agricultural employment. The Supreme Court has directed that the *exemption* be *narrowly* construed.

> The Fair Labor Standards Act was designed "to extend the frontiers of social progress" by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly within its terms and spirit is to abuse the interpretive process and to frustrate the announced will of the people.

*Phillips Co. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945); *see*

---

may be helpful to borrow such terms from the antitrust area because they provide a precise "shorthand" for certain economic concepts, it should be made clear that there is no need or intention to import other antitrust doctrines into the analysis of this case.

7. The Act also contained protections against abuse of child labor, less relevant to the present discussion.

*also Donovan v. Frezzo Bros., Inc.*, 678 F.2d 1166, 1173 (3d Cir.1982). The Secretary's own regulations are in accord. 29 C.F.R. § 270.2 (1984). Imposing a narrow definition on the term "agricultural or horticultural commodity" in the context of the FLSA makes sense because it limits the exception and furthers the general remedial rule. *Id.* The opposite result is achieved, however, when one attempts to take the entire body of administrative and case law under one statute (the FLSA or IRC) and transplant it directly into the text of another statute (the FLCRA). Any neutral and detached reading of the latter, and its legislative history (particularly the hearings held by the respective Senate and House subcommittees) can only compel the conclusion that the purpose of this legislation was to protect migrant workers from abuse by unscrupulous labor contractors. S.Rep. 93–1295, 93rd Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 6442–6443 (1974). This remedial purpose is emasculated by the juxtaposition of statutory terms and administrative definitions from an entirely different context, as the Secretary urges here.

Second, the reasoning suggested by the Secretary requires the court to ignore key language in S.Rep. 93–1295, quoted with emphasis above at pp. 274–275. This passage appears to be the only place in the entire legislative history where forestry is mentioned in particular. The report shows concern over the exploitation of illegal migrant laborers by contractors working for government agencies in forestry. The report then plainly states "The provisions of this bill are intended to apply to such contractors." The Secretary suggests that the meaning of this passage is unclear. I disagree. If the committee had thought that it was simply "borrowing" the narrow definition of "agricultural or horticultural commodity" from the FLSA and incorporating it into Section 3 of the new bill, the quoted passage would be a *non sequitur.* The only way that the bill could reach the workers mentioned in this passage would be if

the language of Section 3 were given a plain, non-technical construction.

Two other courts considering this problem have reached the same conclusion. In *Davis Forestry Corp. v. Smith,* 707 F.2d 1325 (11th Cir.1983) a competitor of a labor contractor who violated the FLCRA attempted to sue the violator. Both parties employed workers in forestry work, including tree planting, tree injecting, forestry spraying, and the like. In reaching the conclusion that the FLCRA did not provide a private right of action to competitors, the 11th Circuit necessarily assumed that the FLCRA governed forestry labor: "There is little doubt that the 1974 amendments to FLCRA were intended to apply to forestry contractors who employ 'tree planters, thinners and other forest laborers.' 1974 U.S. Code Cong. & Ad. News at 6444." *Davis Forestry,* 707 F.2d at 1328 n. 3. The Secretary argues that this language is *dicta* because the case was decided on other grounds, namely, standing. While this is technically correct, it is puzzling to wonder why the 11th Circuit spent several pages in a complex analysis of standing doctrine when the case could have been decided in about two sentences if it was clear that forestry was not covered by the FLCRA. From the quoted footnote, it is obvious that the 11th Circuit found the language in S.Rep. 93–1295 to be significant.

Similarly, in a case still pending before the Southern District of Texas, *Aguirre v. Davis Forestry Corp., et al.,* Civ. B–81–142, Judge Vela was obliged to address the very same issue. After reviewing the statutory purposes and the language in the legislative history, the court found that S.Rep. 93–1295 clearly addressed this particular question: "This court is of the opinion that a more specific statement of intent could not be had." *See* Opinion of March 19, 1984, *Aguirre v. Davis Forestry Corp.,* Civ. B–81–142 (S.D.Tex.).[8] Although this is an interlocutory opinion and is subject to reconsideration during the pendency of that action, this court finds at least some reassurance in the fact that others have

---

**8.** A copy of the opinion is appended as Exhibit 11 to plaintiffs' complaint.

previously adopted the same view. Indeed, it seems that at least one of the Secretary's own regional offices was "misled" into believing that the FLCRA applied to forestry activities based on the same legislative history. (*See* Letter from John Silver, Assistant Regional Administrator for Wage Hour, to David N. Ilchert, District Director of I.N.S., dated April 6, 1977, Exhibit 17 to Plaintiffs' Memorandum in Support of Summary Judgment). Of course, a regional office cannot be deemed to set official DOL agency policy in a matter such as this. But it is ironic to observe cracks in the stone wall of the Secretary's non-enforcement based on the same reasoning under discussion here.

Finally, the court is drawn by the inescapable force of logic to the position urged by plaintiffs. The affidavits submitted by intervenors Villegas, Guerrero, Ponce, Murataya, Meza, and Ramos, which are uncontradicted in this record, illustrate in pathetic detail stories of exploitation at the hands of forest labor contractors.[9] These individuals have been victimized by contractor exaggerations of conditions of employment, deceived about length of employment and wages, transported in unsafe vehicles to remote forestry camps, furnished with unsanitary and substandard housing, and paid in cash, net of unexplained deductions and without records of units worked or taxes withheld. I conclude these are *precisely* the evils at which Congress was taking aim when it broadened the definition of "agricultural employment" in 1974, when it intended to "include all contractors." *See* S.Rep. 93–1295 93rd Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 6442; *see also* the references to hearings cited *supra* at p. 274 hereof.[10] It is inconceivable that Congress intended to protect workers planting fruit trees in an orchard, and to disregard workers planting fir trees on a hillside, when both groups suffer from the same clearly identified harm.[11]

CONCLUSION

This court is normally willing to defer to the expertise of administrative interpretations by the agency charged with execution of particular statutory schemes. *See, e.g., Johnson-Laird, Inc. v. Immigration and Naturalization Service,* 537 F.Supp. 52, 54 (D.Or.1981). But it cannot do so when the agency's interpretation would thwart or subordinate the intent of Congress. *Id.; Markair, Inc. v. Civil Aeronautics Board,* 744 F.2d 1383, 1385 (9th Cir.1984). The construction of the FLCRA urged by the Secretary in this case would accomplish such a result.

For the reasons outlined above, Plaintiffs' and Intervenors' motions for summary judgment are granted; the Secretary's cross-motion is denied. Plaintiffs shall,

---

**9.** This court is not unfamiliar with the abuses of workers by forest labor contractors. I have previously condemned those practices which result in fraud and exploitation of illegal aliens by contractors, loss of jobs for legitimate workers, and disrespect for the processes of the law. I have also commented upon the woeful inadequacy of the criminal justice and immigration systems in dealing with these problems, and called for new legislative mechanisms, "more cost-effective, less blunt, and more flexible than the criminal justice system." *United States v. Gonzalez,* 388 F.Supp. 892, 894–95 (D.Or.1974) (Burns, J.). Properly construed, the MSPA is a step in the right direction.

**10.** Indeed, the Secretary conceded at oral argument on these matters that plaintiffs and intervenors suffered the same abuses as farm workers entitled to the protections of the FLCRA. Counsel stated that the Secretary regrets such abuses and would like to provide some sort of relief, but feels he lacks Congressional authorization to do so.

**11.** The Secretary's position brings to mind the wisdom of Oliver Wendell Holmes when he said:

The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before.

*Johnson v. United States,* 163 F. 30, 32 (1908). The Secretary exhorts the court to ignore both this principle as well as the only available indications of legislative purpose.

within 14 days of the entry of this order, file a proposed form of judgment, not to exceed 2 pages in length. Plaintiffs and Intervenors should, at the same time, file any motions for attorneys fees they intend to request in this case.[12] The Secretary may respond thereto within 14 days. Upon receipt of final papers the court will proceed to issue a comprehensive final judgment resolving all remaining matters.

IT IS SO ORDERED.

---

**12.** Plaintiffs are forewarned, however, that the court does not presently view the Secretary's position in this case of first impression as "substantially unjustified" for purposes of the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) (Supp IV 1980), *repealed* Pub.L. 96–481 § 204(c). *See Foster v. Tourtellotte,* 704 F.2d 1109, 1112 (9th Cir.1983).