Ruben **BRACAMONTES**, et al.,
Plaintiffs–Appellants

v.

The **WEYERHAEUSER CO.**, et al.,
Defendants–Appellees.

No. 87–2456.

United States Court of Appeals,
Fifth Circuit.

March 22, 1988.
Rehearing and Rehearing En Banc
Denied April 25, 1988.

---

**272**

Marc Linder, Texas Rural Legal Aid, Inc., William Beardall, Weslaco, Tex., for plaintiffs-appellants.

Rose Law Firm, Tim Boe, Jim Hunter Birch, Little Rock, Ark., Ewers, Toothaker, Abbott, Talbot & Hamilton, Walter J. Passmore, McAllen, Tex., for defendants-appellees.

Before TIMBERS,* KING and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

■ Appellants are migrant workers whom appellees employed to plant pine seedlings in Alabama. They filed suit under the Migrant and Seasonal Agricultural Worker Protection Act. The district court dismissed the suit because the MSPA did not apply to those performing forestry work exclusively. We reverse, finding that Congress intended the Act to apply to farm labor contractors who hire migrant workers for employment in the farming of trees.

I

Weyerhaeuser hired labor contractors to recruit migrant workers to plant pine seedlings on land owned by Weyerhaeuser in Alabama. The contractors recruited Ruben Bracamontes, Reyes Perez, and Pablo Martinez, Mexican-American migrant agricultural workers from the Rio Grande Valley of Texas, and employed Sendejo to transport the workers to Alabama.

The workers filed this suit on February 27, 1987, alleging violations of the Migrant and Seasonal Agricultural Worker Protection Act,[1] including its provisions for labor contractor registration, disclosure, transportation, housing, and confirmation of registration. The workers asked the district court to enjoin Weyerhaeuser from using farm labor contractors until the company determined that the contractors were registered with the Department of Labor.

The district court granted a motion to dismiss, ruling that the case was factually indistinguishable from *Aguirre v. Davis Forestry Corp.*,[2] in which the court decided that MSPA's predecessor statute, the Farm Labor Contractor Registration Act, did not apply to parties engaged exclusively in forestry activities.[3]

II

■ Congress in 1963 began regulating contractors who supplied migrant agricultural laborers. The Farm Labor Contractor Registration Act defined "migrant worker" as "an individual whose primary employment is in agriculture...."[4] The FLCRA in turn defined agriculture by ref-

---

* Circuit Judge of the Second Circuit, sitting by designation.

1. 29 U.S.C. § 1801 *et seq.*

2. Civil Action No. B–81–142 (S.D. Tex. Mar. 13, 1987).

3. *Id.*

4. 7 U.S.C. § 2042(g) (repealed).

erence to § 203 of the Fair Labor Standards Act[5] and § 3121(g) of the Internal Revenue Code.[6] Both of these sections require that the work be performed on a traditional farm; neither section has been interpreted to include forestry work.[7]

Congress amended FLCRA in 1974. In defining "agricultural employment" Congress retained the references to § 203(f) and § 3121(g) but added a third definition —agricultural employment included "the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of an agricultural or horticultural commodity in its unmanufactured state."[8] The MSPA retained this provision in § 1802(3) when MSPA replaced FLCRA in 1984.[9]

The dispute is over the scope of this third definition. Bracamontes contends that the phrase "agricultural or horticultural commodity" expands MSPA's coverage to include the planting of pine seedlings and that legislative history demonstrates that Congress intended to protect migrant agricultural workers who plant trees. Weyerhaeuser argues that Bracamontes was not engaged in "agricultural employment" within the meaning of the Act and thus cannot be a "migrant agricultural worker" as the Act defines such a worker in § 1802(8).[10] Because the Act's legislative

---

5. (f) "Agriculture" includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities ..., the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.
29 U.S.C. § 203(f).

6. (g) Agricultural labor.—For purposes of this chapter, the term "agricultural labor" includes all service performed—
(1) on a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife;
(2) in the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment, or in salvaging timber or clearing land of brush and other debris left by a hurricane, if the major part of such service is performed on a farm;

(4)(A) in the employ of the operator of a farm in handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, in its unmanufactured state, any agricultural or horticultural commodity; but only if such operator produced more than one-half of the commodity with respect to which such service is performed;
...

As used in this subsection, the term "farm" includes stock, dairy, poultry, fruit, fur-bearing animal, and truck farms, plantations, ranches, nurseries, ranges, greenhouses or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards.
26 U.S.C. § 3121.

7. DOL specifically has stated that "[t]rees grown in forests and the lumber derived therefrom are not 'agricultural or horticultural commodities' " and thus forestry operations do not come within § 203(f) unless "performed by a farmer or on a farm as an incident to or in conjunction with his or its farming operations." 29 C.F.R. § 780.115 (1987).

8. 7 U.S.C. § 2042(d) (repealed).

9. (3) The term "agricultural employment" means employment in any service or activity included within the provisions of section 3(f) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(f)), or section 3121(g) of Title 26 and the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state.
29 U.S.C. § 1802(3).

10. (8)(A) Except as provided in subparagraph (B), the term "migrant agricultural worker" means an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence.
(B) The term "migrant agricultural worker" does not include—
(i) any immediate family member of an agricultural employer or a farm labor contractor; or
(ii) any temporary nonimmigrant alien who is authorized to work in agricultural em-

history indicates that Congress intended the Act to cover migrants who work on tree farms, we agree with Bracamontes that the third definition in § 1802(3) includes the planting of pine seedlings. The question is a close one and either of the interpretations urged are plausible.

### III

We first examine the statute's language, of course. The handling or planting of an "agricultural or horticultural commodity" could be construed in ordinary usage to include the planting of pine seedlings, as well as other forestry labor.[11] We have recognized that agriculture describes a broad activity and that many dictionaries include forestry within the definition of agriculture.[12] The Department of Labor also has recognized that " 'agriculture' is sometimes used in a broad sense as including the science and art of cultivating forests...."[13]

The legislative history of the 1974 amendments to FLCRA also indicates that the Act encompasses farm labor contractors in the forestry business. The Senate Report directly addresses such coverage:

> The Committee has been informed by the Commissioner of the Immigration and Naturalization Service that some government agencies have permitted the employment of illegal aliens as tree planters, thinners and other forest laborers by awarding contracts to forestry contractors who regularly employ aliens who have illegally entered the United States. *The provision of this bill and its penalties are intended to apply to such contractors.*[14]

Bracamontes also points us to the House debates on the Immigration Reform and Control Act of 1986, in which Congressman Weaver stated, "While forestry is sometimes included in the definition of agriculture, this has been done only in broadly remedial statutes like the Migrant and Seasonal Agricultural Worker Protection Act."[15]

Both the Ninth and Eleventh Circuits have decided that Congress specifically intended that the Act cover farm labor contractors in the forestry business.[16] "There is little doubt that the 1974 Amendments were intended to apply to forestry contractors who employ 'tree planters, thinners and other forest laborers.' "[17]

Weyerhaeuser argues that this passage in *Davis* is dictum because the real issue in *Davis* was the standing under the FLCRA of a competitor of a farm labor contractor to challenge the contractor's noncompliance with the FLCRA. However, as the *Bresgal* district court noted, the Eleventh Circuit would not have engaged in a lengthy analysis of standing doctrine if it had been convinced that the FLCRA did not cover forestry.[18] Moreover, contrary to Weyerhaeuser's assertion that *Davis* did not review the legislative history, the Eleventh Circuit relied on the Senate Report of the 1974 amendments.

Interpreting the Act to cover contractors who hire migrants for forestry work also is consistent with one of the Act's purposes, which is to prevent contractor exploitation of migrant and seasonal laborers, particu-

---

ployment in the United States under sections 1101(a)(15)(H)(ii) and 1184(c) of Title 8.

29 U.S.C. § 1802(8).

**11.** *See Bresgal v. Brock,* 637 F.Supp. 271, 273 (D.Or.1985), *aff'd,* 833 F.2d 763 (9th Cir.1987).

**12.** *See United States v. Turner Turpentine Co.,* 111 F.2d 400, 404–05 (5th Cir.1940).

**13.** 29 C.F.R. § 780.200 (1987). DOL in the same section limits coverage under § 203(f) to forestry operations performed on a traditional farm. *Id.*

**14.** S.Rep. No. 1295, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News 6441, 6444 (emphasis supplied).

**15.** 132 Cong. Rec. H9870 (daily ed. Oct. 10, 1986).

**16.** *See Bresgal v. Brock,* 833 F.2d at 766; *Davis Forestry Corp. v. Smith,* 707 F.2d 1325, 1328 n. 3 (11th Cir.1983).

**17.** *Davis,* 707 F.2d at 1328 n. 3 (quoting the Senate Report).

**18.** *See Bresgal,* 637 F.Supp. at 276.

larly aliens.[19] Congress described contractor abuse of migrant labor:

> It is unfortunately an all too common experience for workers to be abused by farm labor contractors. Testimony revealed that in many cases the contractor: exaggerates conditions of employment when he recruits workers in their home base, or that he fails to inform them of their working conditions at all; transports them in unsafe vehicles; fails to furnish promised housing, or else furnishes substandard and unsanitary housing; operates a company store while making unitemized deductions from workers' paychecks for purchases, and pays the workers in cash without records of units worked or taxes withheld.[20]

Forestry laborers are susceptible to similar abuses.[21] Thus, the Ninth Circuit concluded that " '[i]t is inconceivable that Congress intended to protect workers planting fruit trees in an orchard, and to disregard workers planting fir trees on a hillside, when both groups suffer from the same clearly identified harm.' "[22]

## IV

Weyerhaeuser argues that the 1974 amendments broadened the Act's coverage in only two ways; it expanded coverage to intrastate, as well as interstate, commerce, and also added "coverage for employment involving the *processing* of agricultural commodities in an unmanufactured state."[23] Weyerhaeuser thus contends that coverage was expanded *vertically* to all steps in the production chain of products previously covered by the FLSA and IRC definitions,[24] but not *horizontally*, to growing operations not previously covered, such as forestry.

Weyerhaeuser also attacks any reliance on the Senate Report's statement about forestry. Weyerhaeuser stresses that the statement should be limited to its context, discussing *illegal aliens*. But the context is not here so confining. Congress found that illegal aliens comprised a large source of the country's agricultural labor[25] and wanted the Act to cover contractors who hired any migrant labor, not only illegal aliens, for forestry operations.

The vertical expansion of the act is plain, but it is not plain that Congress intended more. The Ninth Circuit concluded that the "handling, planting, [or] drying" mentioned in the third prong all came within the FLSA definition of agriculture.[26] These phrases would be redundant had Congress not meant to deemphasize the activity's location. We also note the similarities between the third prong and § 3121(g)(4)(A) of the IRC. The descriptions of the activities are almost identical. The primary difference is that the third prong drops the restriction that the labor be per-

---

**19.** 1974 U.S. Code Cong. & Admin. News at 6441–45.

**20.** *Id.* at 6442.

**21.** Appellants allege that they were transported in a van without sufficient seats for all the workers, forcing some to lie on the floor or sit on baggage. They also allege that they first were housed in a dwelling that health officials had neither inspected nor certified for occupancy. They claim there was no heat or blankets even though the temperature was below freezing.

The Ninth Circuit also has found that "[t]he conditions that Congress addressed in the [MSPA], and the persons protected, are the same in the forestry industry as in more conventional agricultural industries." *Bresgal*, 833 F.2d at 766.

**22.** *Bresgal*, 833 F.2d at 766 (quoting *Bresgal*, 637 F.Supp. at 277); *cf. Almendarez v. Barrett-Fisher Co.*, 762 F.2d 1275, 1281 (5th Cir.1985) ("The [packing shed operator] defendants identify no functional distinction between their activities vis-a-vis the plaintiffs and those of the middlemen recognized as farm labor contractors before the 1974 amendment.").

**23.** 1974 U.S.Code & Cong.News at 6446 (emphasis added).

**24.** For example, the Act now would cover contractors who supply labor to the tomato cannery whereas before the 1974 amendments the Act only would encompass contractors who hired labor to pick the tomatoes. *See Bresgal*, 637 F.Supp. at 275.

**25.** 1974 U.S.Code Cong. & Admin.News at 6444.

**26.** In discussing nursery and landscaping operations, the Department of Labor recognizes that planting comes within § 203(f). 29 C.F.R. § 780.206(a) (1987).

formed "in the employ of an operator of a farm." We agree that this suggests an intended horizontal reach and did not simply expand coverage to processing—that Congress also intended the Act to cover activities even when not performed on a traditional farm.[27]

Weyerhaeuser argues, and the argument has considerable force, that we should defer to DOL's interpretation of the MSPA [28]—that forestry workers do not perform agricultural employment within the meaning of the Act, that the third definition, like the IRC and FLSA, excludes forestry. DOL has reasoned that Congress in defining "agricultural employment" intended to adopt the previous administrative construction of "agricultural or horticultural commodities," which excluded trees grown in forests and their lumber.[29]

DOL is due deference in its construction of the Act but even with deference, we are persuaded that Congress did not intend so narrow a reading. The FLSA traditionally has exempted those persons employed in agriculture from its remedial provisions concerning minimum wages and maximum hours.[30] The Supreme Court has declared that FLSA exemptions should be construed narrowly,[31] which DOL recognizes.[32] Relatedly, the MSPA is remedial in nature and must be read broadly.[33] The suggested narrow reading of § 203(f) to the MSPA would disserve the Act's remedial purpose.

Weyerhaeuser implies that such a reading creates an internal inconsistency because § 203(f) expressly limits forestry operations to those performed on a farm; reference to § 203(f) then becomes superfluous if the third prong does not in a parallel fashion exclude forestry. We disagree. As we previously have decided, those that do not fall within the FLSA and IRC prongs of § 1802(3) still may be encompassed in the third.[34] Moreover, Weyerhaeuser fails to illuminate any clash in policy if the third prong does not require the work to be performed on a traditional farm.

Finally, Weyerhaeuser offers a related argument that the exclusion of forestry workers is consistent with the general regulatory scheme established by Congress, including Title VII, § 1981, the Service Contract Act of 1965, the Immigration Reform and Control Act of 1986, and the National Labor Relations Act. This is so but the statutes address different evils. We see no unevenness in policy resulting from our reading of the MSPA.

## V

█ The MSPA applies to farm labor contractors who employ those migrant and seasonal agricultural workers engaged in agricultural employment as the Act defines it. Today we hold that Congress intended that agricultural employment include forestry operations even when not performed on a traditional farm. Thus appellants, who planted pine seedlings for Weyerhaeuser, are migrant workers as defined by the Act and consequently are entitled to its protection. In so holding, we acknowledge

---

27. *See Bresgal,* 833 F.2d at 767.

28. *Almendarez,* 762 F.2d at 1281 (stating that with regards to DOL's interpretation of the MSPA that "we are obliged to defer to reasonable interpretation of a statute by an agency charged with its administration").

29. *See Bresgal,* 637 F.Supp. at 275. The Ninth Circuit noted that DOL never had construed the amended § 1802(3) until the onset of the *Bresgal* litigation. *See Bresgal,* 833 F.2d at 768.

30. *See* 29 U.S.C. § 213(a)(6). This exemption, however, has been significantly changed. *See* 29 U.S.C.A. § 213(a)(6) (Supp.1986).

31. *See Phillips Co. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945).

32. *See* 29 C.F.R. § 780.2 (1987).

33. *See Soliz v. Plunkett,* 615 F.2d 272, 275 (5th Cir.1980); *see also Montelongo v. Meese,* 803 F.2d 1341, 1346 n. 15 (5th Cir.1986) (same), *cert. denied,* —— U.S. ——, 107 S.Ct. 2179, 95 L.Ed.2d 835 (1987); *Almendarez,* 762 F.2d at 1281 (same).

34. *See Almendarez,* 762 F.2d at 1280 (finding that Congress intended to extend FLCRA to packing shed operators as farm labor contractors even though such operators did not fall literally within IRC and FLSA definitions of "agricultural employment").

that the question is difficult. On balance, we are persuaded by the remedial purposes of the Act and the difficulties of migrant workers planting trees and produce, and the explicit language of the Senate Report. Finally, we are reluctant to disagree with the two circuits who have considered the issue and create a conflict among circuits over an admittedly difficult task of locating congressional purpose.

REVERSED.