Margarita AVILA, et al., Plaintiffs,

v.

A. SAM & SONS, et al., Defendants.

No. 89–CV–242A(H).

United States District Court, W.D. New York.

June 28, 1994.

764

Helen Reagan–Wight, Rochester, NY, for plaintiff.

John A. Galeziowski, Hamburg, NY, for defendant.

## DECISION & ORDER

HECKMAN, United States Magistrate Judge.

The parties have consented to trial before the undersigned pursuant to 28 U.S.C. § 636(c). A non-jury trial was held from February 28 through March 3, 1994. Following the trial, the parties submitted proposed findings of fact and conclusions of law. After these pleadings were filed, the parties presented closing arguments to the court on April 15, 1994. What follows below is the court's findings of fact and conclusions of law.

### BACKGROUND

In this case, ten Haitian Creole farm workers challenge the labor practices of defendants during the 1987 tomato and cucumber harvest. Seven of the ten plaintiffs [1] testified at trial using a Haitian Creole interpreter to translate their testimony. Depositions from the three remaining plaintiffs [2] were admitted into evidence.

The parties stipulated that A. Sam and Sons Produce Company, Inc. is an agricultural employer for all time periods relevant to the trial. In 1987, Esau Sam was the president of the board of directors. He was in charge of deciding how many workers were needed to harvest the crops, and he recruited farm labor contractors and their crews to work on the farm.

Esau Sam's son, Robert Sam, hired workers to plant and cultivate the fields and assigned crews to pick different fields at harvest time. Esau Sam's sister, Helen Sam, was the corporate secretary and supervised the payroll of the farm.

A. Sam and Sons normally hires between 40 and 70 migrant farm workers for the harvest season. The harvest season starts in late July or August and runs through October, depending on weather.

According to documents filed with the New York State Department of Labor, A. Sam and Sons used several crew leaders in the summer of 1987 to supply harvest workers. These included the crews of Hector Martinez (Ex. 5B), Faustino Hernandez (Ex. 5A), Rigoberto Rivas (Ex. 14A) and Lionel Losolla (Ex. 14B). Each of these crew leaders signed an "Application for Farm Labor Contractor Certificate of Registration." This form was co-signed in each case either by Helen Sam or Esau Sam on behalf of the corporation and filed with the State Department of Labor. Each of these forms indicate the number of workers to be provided, the home state of the workers, the date work was to begin and end, the rate of pay, the housing arrangements for the workers and the policy numbers of the corporate workers compensation and disability policies. Also on file with the State Department of Labor is an "Application for Migrant Labor Registration Certificate" signed by Helen Sam in May of 1987 on behalf of A. Sam and Sons. It states that the farm planned to hire 20 migrant workers from Puerto Rico between May and October of 1987 to harvest tomatoes, cucumbers and cabbages, and that the laborers would reside in a labor camp provided on the farm at no charge (Ex. 5C).

### The Isaac Crew

The testimony at trial established that eight of the plaintiffs (Merzee Edouard, Bethany Isaac, Wilbert Val, Nathan Metelus, Nerestin Labonte, Lometace Holland, Gracile Jean and Yolande Isaac) were migrant agricultural workers who worked for crew leader Mompremier Isaac. In 1987, Isaac

---

1. Lometace Holland, Gracile Jean, Nathan Metelus, Merzee Edouard, Delorme Corrier, Nerestin Labonte and Joseph Wilbert Val.

2. Yolande Isaac, Bethany Isaac and Yvonne Corrier.

invited them to work at A. Sam & Sons in Dunkirk, New York picking tomatoes. He promised them that there was work available for several months, that housing would be provided, and that they would be paid $2.10 per bucket of cherry tomatoes and $0.40 per bucket of regular tomatoes. These agricultural workers resided in Florida and were driven to Dunkirk, New York in Isaac's van.

In August of 1987, on their way to New York, Mompremier Isaac got lost in Pennsylvania. He located a taxi driver who called the farm and obtained directions to the farm from Esau Sam. Isaac then followed the taxi to the farm.

When Isaac arrived at the farm with the crew, there was a dispute over the taxi driver's fee. Mompremier Isaac refused to pay the taxi driver and the police were called. Esau Sam advanced the cab fare to the taxi driver.

As to plaintiffs' recruitment by Isaac, neither of the two crew leaders was available to testify at trial. However, each of the plaintiffs in the Isaac crew provided similar testimony as to the representations Isaac had made to them regarding the availability of work at the A. Sam and Sons farm in Dunkirk, New York, the pay to be provided, the housing arrangements and the type of work, i.e., picking cherry tomatoes. In addition, plaintiff Merzee Edouard testified that she was in Florida at Mr. Isaac's residence in 1987 when the telephone rang. She answered the phone and testified that the man on the other end of the line was looking for Mompremier Isaac. In broken English, she told him that Isaac was not present. The man stated that his name was "A. Sam." She testified that the same person called Isaac two or three times in July of 1987, gave her his name and asked her to have Isaac call him back. She was present when Isaac returned A. Sam's call. After the conversation, Isaac told her that the "bossman" called and there was no work in Virginia but there was work in Dunkirk, New York. Isaac then told her that the caller was A. Sam and that there was good work available. As a result of these representations, she agreed to go with Isaac to the A. Sam and Sons farm in New York.

Defendants admit that they employed the Isaac crew in 1987, both in the fields and in the packing house (see Exs. 4A, 4B, 4C, 7E and 7F). However, defendants deny that they recruited Isaac, claiming instead that he simply showed up at the farm with his crew and requested work. It is undisputed that defendants had a farming operation in Virginia and that Esau Sam had met Isaac while he was working in Virginia in previous years. According to Esau Sam, he did not speak to Mompremier Isaac about work in 1987 until Isaac had the taxi cab driver call him from Pennsylvania on his way to the farm. At that time, Esau Sam provided the taxi driver with directions to the farm. When Mompremier Isaac arrived at the farm, he asked whether work was available and Esau Sam told him that work was slow. Esau Sam testified that he felt sorry for Isaac and his crew. He knew that they needed to work and he wanted Isaac to repay the debt for the taxi cab, so he told Isaac to look for work in the packing house. He also gave Isaac the names of several other farms in the area that he thought would need crews. According to Esau Sam, he believed that Isaac was going to work at a neighboring farm in the area. He knew that Isaac had worked in previous years for one of the farmers known as Girardo Rizzo in Fredonia, New York.

The defendants admit that they did not create or keep their normal business records for the Isaac crew. The workers were not required to fill out employment applications. They were not paid directly for their labor but rather were paid through the crew leader Isaac. According to Esau Sam, normal business records were not kept because he had no plan to employ Isaac and his crew for the season. Esau Sam also claims that at least two of the checks issued to Mompremier Isaac were for harvesting work performed by Isaac's crew at other farms in the area. A. Sam and Sons purchased the produce picked by these farms and agreed to pay the crew leader for the work. The A. Sam and Sons labor camp was already filled to capacity and no housing was provided to the members of Isaac's crew.

### The Losolla Crew

The remaining two plaintiffs (Delorme Corrier and Yvonne Corrier) were migrant agricultural workers who worked for crew leader Lionel Losolla. Losolla himself did not testify at trial. Delorme Corrier testified that he and his wife were recruited to go to New York in 1987 by Lionel Losolla. Corrier previously worked for A. Sam and Sons in 1984 and had been brought there by farm labor contractor Isaac. In 1987, before going to New York, he asked about lodging because he was bringing his wife and child. Losolla assured him that both good work and housing were available.

As already noted, plaintiffs introduced into evidence an "Application for Farm Labor Contractor Certificate of Registration" for Lionel Losolla filed with the State Department of Labor. This indicates that Losolla would be providing up to forty farm workers in August through October of 1987 and that he would be recruiting and transporting workers. It is signed by both Lionel Losolla and Helen Sam on behalf of the corporation.

Defendants deny recruiting Losolla for the 1987 harvest season. According to Esau Sam, Losolla had previously worked as a farm labor contractor for A. Sam and Sons. Losolla and Esau Sam talked on the telephone sometime during the winter of 1987. Losolla asked Esau Sam if his crew was needed for 1987. According to Esau Sam, he told Losolla not to come and that arrangements had been made for the hiring of other workers. Esau Sam was not satisfied with Losolla's work, and he believed that Losolla's son had stolen tools during the 1986 harvest season.

Esau Sam testified that Losolla later called him during the Virginia harvest season and asked him about work. Losolla told Esau Sam that he was bringing a crew to Peter Baker's farm in Ransomville and wanted to know if defendants needed extra workers. Again, Esau Sam told Losolla that he was not needed.

In August of 1987, Losolla showed up at the farm. The defendants admit employing Losolla and his crew on a limited basis. The exhibits support this. Exhibit 1 is a check payable to the order of Delorme Corrier dated August 13, 1987. In addition, Exhibits 7A, 7B and 7C are all checks payable to Lionel Losolla. Helen Sam testified that these checks represented payment to Losolla for both his work and the work of his crew. Delorme Corrier's name also appears on a personnel record of the company (Ex. 8B).

The testimony and evidence shows that despite employing plaintiffs, defendants did not keep employee earnings records or prepare wage statements for the plaintiffs. They also did not keep time cards for these and other plaintiffs. No written disclosures were provided to any of the plaintiffs.

The evidence shows that when the plaintiffs arrived at A. Sam and Sons farm, they slept in the van or outside on the ground for several days. Several of the plaintiffs had infant children who slept outside on the ground with them. There were no bathroom or cooking facilities available to them while they lived on the farm. Plaintiffs eventually found housing in hotels for a period of time. Due to lack of work, they eventually moved to other farms or returned to their residences in Florida.

## CONCLUSIONS OF LAW

### I. Coverage under AWPA

It is uncontested that the court has jurisdiction over the action under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1844(a) ("AWPA" or the "Act"). It is also undisputed that the plaintiffs worked on the defendants' farm in August of 1987, where they picked tomatoes and worked in the packing shed. These activities constitute "agricultural employment" under the AWPA. 29 U.S.C. § 1802(3).

### A. Migrant Worker Status

Section 1802(8)(A) of the AWPA defines "migrant agricultural worker" as "an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence." Defendants argue that several of the plaintiffs failed to establish the location of their permanent residences, and that

therefore they failed to establish coverage under the Act. Defendants cite the testimony of Lometace Holland, Nathan Metelus and Delorme Corrier, all of whom in substance testified that in 1987 they had no permanent addresses because they migrated from place to place doing seasonal agricultural work.

Defendants' argument must be rejected. All of the plaintiffs, including Holland, Metelus and Corrier, meet the definition of migrant agricultural worker. It is clear that in 1987 the workers came to New York from Florida in order to perform seasonal agricultural labor. Their work in New York was temporary and they were required to be absent from Florida overnight. The fact that a few of the plaintiffs, through an interpreter, disclaimed permanent addresses does not diminish their status as migrant agricultural workers.

As plaintiffs' counsel points out, the plaintiffs resided on the farm property and in motels or other temporary housing while they worked at A. Sam and Sons. The AWPA legislative history and implementing regulations make clear that a labor camp or other temporary farm worker housing cannot be a permanent place of residence for purposes of AWPA. H.R.Rep. No. 97–885, 97th Cong., 2d Sess. 8 (Sept. 28, 1982), *reprinted in* 1982 U.S.C.C.A.N. 4547, 4554; 29 C.F.R. § 500.20(p)(2). It is also clear that all of the plaintiffs were domiciled in Florida. Furthermore, this court has already found, in a report and recommendation dated October 14, 1992 and adopted November 16, 1992, that plaintiffs Delorme Corrier, Nerestin LaBonte, Lometace Holland, Nathan Metelus, Wilbert Val and Gracile Jean are migrant agricultural workers protected by AWPA.

■ Defendants argue that two of the plaintiffs, Bethany Isaac and Merzee Edouard, are related to crew leader Mompremier Isaac and therefore cannot qualify as "migrant agricultural workers." Section 1802(8)(B)(i) excludes from the definition of "migrant agricultural worker" "any immediate family member of . . . a farm labor contractor." Under the regulations, "immediate family" includes a "spouse" and a "brother." 29 C.F.R. § 500.20(*o*). The testimony introduced at trial showed that Bethany Isaac is a half brother of Mompremier Isaac, sharing the same father (Ex. 24 at 8). Merzee Edouard is not married to Mompremier Isaac but lived with him for a period of years and has four children fathered by him between 1985 and 1990, one of whom was born while they were working on the A. Sam and Sons farm in 1987.

■ There are no court decisions interpreting 29 U.S.C. § 1802(8)(B)(i). As a general principle, the AWPA is to be broadly construed to protect migrant agricultural workers. *Caro–Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1505 (11th Cir.1993); *Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271, 276 (5th Cir.), *cert. denied*, 488 U.S. 854, 109 S.Ct. 141, 102 L.Ed.2d 113 (1988); *Marshall v. Green Goddess Avacado Corp.*, 615 F.2d 851, 857 (9th Cir.1980). Because half brothers and live-in companions are not included in the definition of "immediate family members," they should not be excluded from coverage by the Act. I therefore find that Bethany Isaac and Merzee Edouard are migrant agricultural workers protected by AWPA.

### B. *Agricultural Employers*

■ The trial testimony clearly establishes that defendant A. Sam and Sons Produce Co., Inc., Esau Sam and Robert Sam are agricultural employers within the meaning of the Act. The AWPA defines "agricultural employers" as any person who owns and operates a farm and who recruits, transports or employs migrant workers. 29 U.S.C. § 1802(2). The term "to operate" means "to manage." 29 U.S.C. § 1802(5); *Mendoza v. Wight Vineyard Management*, 579 F.Supp. 268, 272 (N.D.Ca.1984), *aff'd*, 783 F.2d 941 (9th Cir.1986) (per curiam). Esau Sam was in charge of the overall farm operation, was President of the Board of Directors of A. Sam and Sons, and recruited farm labor contractors. Robert Sam was the farm manager, hired farm workers and supervised the cultivation of the crops. The corporate defendant owns the farm and its operation.

## C. *Farm Labor Contractors*

It is undisputed that Mompremier Isaac and Lionel Losolla are farm labor contractors within the meaning of AWPA. 29 U.S.C. § 1802(7).

## II. *Housing Violations*

29 U.S.C. § 1823(a) provides in pertinent part as follows:

[E]ach person who owns or controls a facility or real property which is used as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal and State safety and health standards applicable to that housing.

The regulations provide further clarification of how responsibility for violations is determined. 29 C.F.R. § 500.130 provides in part as follows:

(a) ... If more than one person is involved in providing the housing for any migrant agricultural worker (for example, when an agricultural employer owns it and a farm labor contractor or any other person operates it), both persons are responsible for ensuring that the facility or real property meets the applicable Federal and State housing standards.

(b) A farm labor contractor, agricultural employer, agricultural association or any other person is deemed an "owner" of the housing facility or real property if said person has a legal or equitable interest in such facility or real property.

(c) A farm labor contractor, agricultural employer, agricultural association or any other person is in "control" of a housing facility or real property, regardless of the location of such facility, if said person is in charge of or has the power or authority to oversee, manage, superintend or administer the housing facility or real property either personally or through an authorized agent or employee, irrespective of whether compensation is paid for engaging in any of the aforesaid capacities.

The applicable federal safety and health standards are those set forth in 29 C.F.R. § 500.132. Specifically, applicable standards are those promulgated by the Employment and Training Administration at 20 C.F.R. § 654.404 *et seq.* and the standards promulgated by the Occupational Safety and Health Administration ("OSHA") at 29 C.F.R. § 1910.142. Under 29 C.F.R. § 500.133, the substantive safety and health standards are defined to include at a minimum "those that provide fire prevention, an adequate and sanitary supply of water, plumbing maintenance, structurally sound construction of buildings, effective maintenance of those buildings, provision of adequate heat as weather conditions require, and reasonable protections for inhabitants from insects and rodents."

■ It is clear from the evidence at trial that defendants violated 29 U.S.C. § 1823(a) as to all ten plaintiffs. Virtually all of plaintiffs testified that they slept on defendants' premises in Mompremier Isaac's van or outside the packing house for up to one week and in some instances longer. There were no showers, bathrooms or cooking facilities.

The testimony of the plaintiffs as to housing arrangements was corroborated by two other witnesses, Gloria Farhat and Troy J. Oechsner. Gloria Farhat is the Program Director for Rural Opportunities in Dunkirk, New York. That agency provides employment training and support services for migrant agricultural workers. Ms. Farhat testified that she visited the A. Sam and Sons farm in the summer of 1987. There was a group of Haitians in the vicinity of the packing house looking for housing. She assisted the workers with young children in obtaining rooms at a motel over the weekend, and then returned to the farm that following week to assist the other workers. On one of the occasions when she visited, she saw a bus parked next to a gazebo near some trees and observed a number of Haitian and Mexican farm workers in and outside of the bus. Some of the workers complained to her that they did not have a place to sleep and that they had been sleeping outside next to the gazebo. She also observed clothing around the gazebo which looked like it had been used for bedding (Transcript of March 1, 1994, pp. 193–203).

Troy Oechsner is currently an Assistant Attorney General for the State of New York

and had worked for Farmworker Legal Services as a summer intern while in law school. He testified that he met Esau and Helen Sam in early July of 1988, the year following the events in question. He recalled that Esau and Helen Sam acknowledged that in 1987 the Losolla crew slept in cars outside the packing house on the farm property (Transcript of March 1, 1994, p. 275).

The defendants claim they did not violate 29 U.S.C. § 1823(a) because there is no evidence that the defendants actually provided housing to the plaintiffs. This claim must be rejected in view of the overwhelming weight of the trial evidence. The packing house was in close proximity to Helen Sam's residence, and workers slept in or near the packing house for several days. Defendants' testimony that they were unaware of any housing violations is not credible.

In sum, I find that the defendants have violated 29 U.S.C. § 1823(a) by allowing migrant workers to stay on the premises without meeting the minimum substantive safety and health standards defined by 29 C.F.R. § 500.133.

### III. *Disclosure Violations*

29 U.S.C. § 1821(a) provides in relevant part as follows:

Each farm labor contractor, agricultural employer, and agricultural association which recruits any migrant agricultural worker shall ascertain and disclose in writing to each such worker who is recruited for employment the following information at the time of the worker's recruitment:

(1) the place of employment;

(2) the wage rates to be paid;

(3) the crops and kinds of activities on which the worker may be employed;

(4) the period of employment;

(5) the transportation, housing, and any other employee benefit to be provided, if any, and any costs to be charged for each of them

. . . .

Furthermore, § 1821(g) provides that the disclosure shall be written in English or, if the worker is not fluent or literate in English, in the worker's native language.

Defendants deny that they recruited the plaintiff workers and therefore deny any liability under this section. Defendants further argue that they are not responsible for the promises of the crew leaders because the crew leaders were not authorized to make any promises on their behalf.

Plaintiffs have the burden of proving violations of this section by the preponderance of the evidence. It is undisputed by defendants that plaintiffs were promised work and housing by the crew leaders before they left their permanent residences and traveled to New York. It is also admitted that no written disclosures were made. The issue is whether defendants authorized the crew leaders to recruit the workers and therefore can be held responsible under § 1821(a) for the lack of written disclosures.

Plaintiffs have failed to provide any direct evidence to support their claim. The crew leaders themselves did not testify, and the defendants deny authorizing the crew leaders to recruit workers for the 1987 harvest season.

The only evidence offered by plaintiffs is circumstantial. According to Gloria Farhat, Robert Sam acknowledged that he requested the farm workers to come to New York. Furthermore, the defendants testified that they frequently have a shortage of farm workers and that they are always concerned about having enough farm workers to harvest the crops. Esau Sam did pay for Isaac's cab when he arrived. Helen Sam filled out a farm labor contractor certificate of registration for crew leader Lionel Losolla, which stated that Losolla would be recruiting and transporting workers on behalf of the farm for the 1987 harvest season.

This circumstantial evidence is insufficient to meet plaintiffs' burden of proof. With the exception of the Farhat testimony, each of these items was explained by defendants at trial. Esau Sam testified that he wanted the state police off his farm and therefore advanced money to Isaac, which Isaac worked off over time. Losolla arrived unsolicited, but Esau Sam then decided to use his crew. Helen Sam attempted to comply with at least

some of the requirements by signing the certificate of registration for Losolla.

Farhat's testimony alone is insufficient to carry plaintiffs' burden of proof.

Plaintiffs argue that the term "recruit" under 29 U.S.C. § 1821 does not require proof of advanced recruitment but is equivalent to "hiring" of plaintiffs. This argument is unpersuasive. The statute does not define the term "recruit". However, the legislative history contemplates that disclosure under 29 U.S.C. § 1821(a) would occur before the actual migration to the work site:

> In the case of most migrant agricultural workers this recruitment and accompanying disclosure will occur before the worker leaves his permanent place of residence, although it may also occur en route as in the case of the migrant family on their way to employment in a distant state which learns from a recruiter while traveling that better work is available at a different destination. The [purpose of the disclosure provision is] to ensure that workers to the greatest possible extent have full information about where they are going and what the conditions will be when they arrive before they begin their journey.

H.R.Rep. No. 97–885, *supra* at 14, *reprinted in* 1982 U.S.C.C.A.N. at 4560.

■ The AWPA's legislative history makes clear that the purpose of the disclosure provisions is to permit the migrant workers to make informed choices about offers of employment before traveling great distances to harvest crops. There is nothing in the legislative history to suggest that the recruitment phase continues right up to the time the workers are actually hired by the employer. The "recruitment" of a migrant worker ends when the employee leaves his place of permanent residence, or while traveling to the employment destination. *Sanchez v. Overmyer*, 845 F.Supp. 1183 (N.D.Ohio 1993); *Alex v. Jasper Wyman & Sons*, 682 F.Supp. 87, 88–89 (D.Me.1988); *but see Rodriguez v. Jackson*, 110 Lab.Cas. (CCH) ¶ 35,137, 1988 Westlaw 150697 (D.Ariz.1988); *Contreras v. Mount Adams Orchard Corp.*, 744 F.Supp. 1007 (E.D.Wash. 1990). Accordingly, the mere hiring of the plaintiffs when they arrived in New York in 1987 is insufficient to trigger the disclosure requirements of the Act.

## IV. *Transportation Violations*

29 U.S.C. § 1841 sets forth motor vehicle safety standards for the protection of migrant farm workers. Vehicles used to transport farm workers to and from the work site must meet proper safety standards, the driver must be licensed, and proper levels of insurances must be in place. 29 U.S.C. § 1841(b), (c). This requirement applies to transportation of workers by a farm labor contractor. 29 C.F.R. § 500.100(c).

■ Defendants violated 29 U.S.C. § 1841(b)(1) by "using, or causing to be used" Isaac's van to drive workers to and from A. Sam and Sons' fields. Isaac did not have a valid driver's license and was not authorized by the U.S. Department of Labor to drive or transport agricultural workers in August of 1987 (Ex. 10A).

## V. *Record Keeping Violations*

■ Plaintiffs next claim that defendants violated 29 U.S.C. § 1821(d)(1), which requires agricultural employers to maintain and preserve certain wage and payroll records for migrant agricultural workers.

Defendants admit that they failed to maintain adequate payroll records for plaintiffs Wilbert Val, Nathan Metelus, Nerestin Labonte, Gracile Jean and Lometace Holland (Stipulated Facts, ¶¶ 20–25). Defendants likewise have no employment or payroll records for plaintiffs Merzee Edouard, Yolande Isaac, Yvonne Corrier and Bethany Isaac. As to Delorme Corrier, the farm records contain one check payable to him dated August 13, 1987 and one other payroll record with his name on it (Ex. 13). However, these records are admittedly incomplete and do not meet the requirements of § 1821(d)(1).

In sum, defendants kept virtually no records of plaintiffs' employment. There is one single check paid to plaintiff Delorme Corrier, but otherwise defendants have no time cards for plaintiffs and only one farm labor sheet for one day of work listing several of the plaintiffs' names.

The AWPA also requires that agricultural employers provide each migrant worker with wage statements relating to their labor. These wage statements are to be issued each payday and must include information regarding the basis on which wages are paid, the number of piece work units earned, the number of hours worked, total pay period earnings and specific sums withheld and the purpose of each withholding, as well as the net pay. 29 U.S.C. § 1821(d)(2); 29 C.F.R. § 500.80(d).

In 1987, defendants did not attempt to comply with this AWPA provision regarding any of the plaintiffs. The only items plaintiffs received from defendants were envelopes listing the name of the farm labor contractor, the name and telephone number of A. Sam and Sons and presumably the net wages paid. Defendants' failure to provide proper wage statements to plaintiffs is a violation of AWPA.

For these reasons, defendants have violated both § 1821(d)(1) and 1821(d)(2) for all ten plaintiffs.

## VI. *Providing False Information*

■ Plaintiffs claim that the defendants knowingly provided false information to them concerning the availability of employment and housing at the A. Sam and Sons farm during the 1987 tomato harvest. 29 U.S.C. § 1821(f) prohibits any agricultural employer from knowingly providing "false or misleading information to any migrant agricultural worker concerning the terms, conditions, or existence of agricultural employment...."

Plaintiffs cannot sustain this claim. The farm labor contractors made promises to the migrant workers regarding the availability of work at A. Sam and Sons and the housing arrangements there. Plaintiffs clearly relied on these promises when they decided to travel to New York and work for the defendants.

However, for the reasons explained above with regard to disclosure violations, plaintiffs have failed to prove that the defendants actually authorized the crew leaders to make these promises. Accordingly, defendants cannot be responsible for these statements of the farm labor contractors.

## VII. *Violations of the Working Arrangement*

■ Plaintiffs claim that the defendants violated the working arrangement with the farm workers, "without justification," by failing to provide plaintiffs with housing and sufficient work. 29 U.S.C. § 1822(c). Regulations promulgated by the Department of Labor permit an employer to change the terms of the working arrangement only due to acts of God or because of "conditions beyond the control of the person or ... conditions which he could not reasonably foresee". 29 C.F.R. § 500.72(a). Agricultural employers have been held responsible for promises of housing, work and transportation independently made by farm labor contractors to farm worker employees, and an agricultural employer's failure to abide by these promises is a violation of the working arrangement under 29 U.S.C. § 1822(c). *See, e.g., Maldonado v. Lucca*, 636 F.Supp. 621, 627 (D.N.J.1986).

Here, plaintiffs again have failed to meet their burden of proof. For the reasons explained above, defendants cannot be held responsible for the promises made by the farm labor contractors because plaintiffs have not proven that the defendants knew of or authorized the farm labor contractors' promises.

## VIII. *Use of Unregistered Farm Labor Contractors*

■ AWPA requires that individuals providing farm labor contracting activities secure a certificate of registration from the United States Secretary of Labor. 29 U.S.C. § 1811(a); 29 C.F.R. § 500.40. In addition, agricultural employers who hire farm labor contractors must take "reasonable steps to determine that the farm labor contractor possesses a certificate of registration which is valid and which authorizes the activity for which the contractor is utilized." 29 U.S.C. § 1842.

Here, the proof shows that farm labor contractor Isaac possessed a certificate of registration as a farm labor contractor, but it had expired on June 30, 1987. (Ex. 10A, 10B). Farm labor contractor Losolla like-

wise had no valid certificate as of August of 1987.

It is clear that the defendants failed to verify either Isaac's or Losolla's farm labor contractor registration status. It is also clear that the defendants utilized the services of Isaac and Losolla to hire and transport workers. Accordingly, defendants failed to comply with 29 U.S.C. § 1842 as to both crew leaders.

## IX. *Damages*

▆▆▆ The AWPA permits migrant agricultural workers to recover damages for intentional violations of the Act. 29 U.S.C. § 1854(c). In interpreting this standard, the courts have concluded that the common civil standard is to be used, holding a person liable for the natural consequences of a person's acts. *Rivera v. Adams Packing Association, Inc.*, 707 F.2d 1278, 1283 (11th Cir. 1983) (interpreting Farm Labor Contractor Registration Act); *Campbell v. Miller*, 836 F.Supp. 827, 830 (M.D.Fla.1993). No specific intention to violate the law is required, and lack of knowledge of the Act is not a defense to a finding of intentionality. *Bueno v. Mattner*, 829 F.2d 1380, 1385–86 (6th Cir.1986), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1987). Therefore, the defendant need only deliberately and consciously engage in the action which lead to the violation of the Act. *Campbell v. Miller*, *supra*; *Saintida v. Tyre*, 783 F.Supp. 1368 (S.D.Fla.1992).

▆▆ Here, the proof at trial establishes that the defendants deliberately and consciously engaged in the conduct which resulted in the AWPA violations discussed above. The documentary evidence shows that the defendants had been previously cited by the U.S. Department of Labor for violations of AWPA in 1987. Specifically, on May 22, 1987, defendants were assessed civil monetary penalties for violations of the disclosure, record keeping, wage statement and other provisions of AWPA in 1986. In addition, on February 25, 1988, defendants were assessed civil monetary penalties for violations of AWPA in 1987 regarding disclosure, wage statements and registration. (Stipulated Facts, ¶ 30).

In light of the prior violations resulting in the May 1987 assessment, defendants' violations in this case were clearly "intentional" under the Act. Indeed, Helen Sam admitted that the defendants departed from their normal bookkeeping procedures in virtually all of their practices regarding these plaintiffs. With regard to the housing and transportation violations, the preponderance of the evidence at trial shows that the defendants knew that workers were residing on their property without regard to applicable safety and health standards, and that Mompremier Isaac was transporting workers to defendants' fields without a license or without Labor Department authorization.

Accordingly, I find that defendants have intentionally violated the housing, transportation, record keeping, wage statement and registration provisions of the AWPA. I also find that, pursuant to 29 U.S.C. § 1854(c), the statutory remedy of $500.00 per violation is appropriate for each of the ten plaintiffs, resulting in a total award of statutory damages in the amount of $25,000.00, to be paid to plaintiffs' counsel.

### *CONCLUSION*

Based on the foregoing, I find that plaintiffs have proved by a preponderance of the evidence that defendants have violated the housing, transportation, record keeping, wage statement and registration provisions set forth at 29 U.S.C. §§ 1823(a), 1841(b)(1), 1821(d)(1), 1821(d)(2), and 1842. I also find that these violations were intentional for the purposes of awarding statutory damages under 29 U.S.C. § 1854(c).

The Clerk of the Court is directed to enter judgment in favor of the plaintiffs in the amount of $25,000.00.

**SO ORDERED.**