[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 14, 2003
THOMAS  K. KAHN
CLERK

No. 03-10387

D. C. Docket No. 01-00335 CV-3-RV-MCR

DAGOBERTO MORANTE-NAVARRO,
ANDRES ASCENCIO-RODRIGUEZ, et al.,

Plaintiffs-Appellants,

versus

T & Y PINE STRAW, INC.,
ISAIAS TAMEZ,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Florida

**(November 14, 2003)**

Before DUBINA, WILSON and KRAVITCH, Circuit Judges.

DUBINA, Circuit Judge:

Appellants, fourteen Mexican nationals ("Plaintiffs"), brought suit against T & Y Pine Straw, Inc. ("T&Y") and Isaias Tamez (collectively referred to as "Defendants"), alleging that Defendants violated the Migrant and Seasonal Agricultural Workers Protection Act, codified at 29 U.S.C. §§ 1801-1872 (1988) ("AWPA"), and the Fair Labor Standards Act, codified at 29 U.S.C. §§ 201-219 (1988) ("FLSA"), by not paying proper hourly and overtime wages. The district court found that Plaintiffs were not engaged in "agricultural employment" within the meaning of the AWPA. For the reasons that follow, we reverse the district court's judgment and remand this case for further proceedings consistent with this opinion.

## I. BACKGROUND

*A. Facts*

The facts are not in dispute. Tamez and his wife own T&Y, which is a Florida corporation in the business of the commercial sale of pine straw. T&Y leases privately-owned land for gathering pine straw and sells the baled pine straw to Southern Straw of Opelika, Alabama, based on a pre-agreed price per bale.

Pine straw is the fresh, undecomposed pine needles that have fallen from pine trees. It is produced commercially and collected for use as a mulch and groundcover. Although all pine forests or pine woodlands produce pine straw, the

2

vast majority of pine straw gathered for commercial sale is collected from pine stands, or "plantations," grown for commercial timber.

In order to gather pine straw, workers must first clear the ground of underlying plants and debris, which often requires the mechanical mowing of ground vegetation by a "bush hog," and the manual clearing of loose branches and pine cones. After clearing the tract, workers rake the pine straw and deposit it into a bailing box, which compresses the pine straw into bales. Workers then load the pine straw onto trucks with a forklift. Individual pine straw workers can generally gather and bale between 100 and 200 bales of pine straw per day, covering about one-half acre of land.

In 2001, T&Y hired Plaintiffs, who are temporary foreign workers, through the H-2B visa program,[1] to rake, gather, bale, and load pine straw. T&Y set out in its temporary labor certification application to the United States Department of Labor ("DOL") that the prevailing wage its temporary foreign workers would receive was $6.65 per hour of work. Plaintiffs were told they would receive 70 cents per bale for each bale of pine straw. They worked between 10 and 11 hours per day. Accordingly, a worker who averaged gathering and baling 100 bales a

---

[1]The term "H-2B" is derived from the section of the Immigration and Nationality Act that authorizes the admission of aliens to perform unskilled work of a temporary nature. 8 U.S.C. § 1101(H)(ii)(b).

day during a 10-hour day could expect to receive approximately $7.00 per hour. T&Y, however, reduced Plaintiffs' compensation by certain expenses so that Plaintiffs actually received, on average, less than $6.65 per hour. In addition, several workers received no compensation for their final week of work. These deducted expenses included a $400 processing fee T&Y was required to pay to its agent for filing H-2B applications, $153 for visa-related expenses, and $197 for bus fare between Monterrey, Mexico, and the work site.[2]

### B.    Procedural History

Plaintiffs filed their complaint for money damages, declaratory relief, and injunctive relief. After Defendants' filed their answer and initial discovery was conducted, the district court entered a consent order approving an agreement between the parties settling and resolving most of Plaintiffs' claims. As a condition of the settlement agreement, however, the district court retained jurisdiction to resolve the remaining issue of whether the AWPA applies to Defendants' pine straw business.

Plaintiffs filed a motion for summary judgment in the district court arguing that (1) Plaintiffs' employment was of a seasonal or temporary nature, and (2) the

---

[2] Such costs cannot lawfully be credited against the employer's minimum wage obligations to the workers. *Arriaga v. Florida Pac. Farms, L.L.C.*, 305 F.3d 1228, 1236 (11th Cir. 2002).

4

raking, gathering, baling, and loading of pine straw is "agricultural employment" within the meaning of the AWPA. The district court granted in part and denied in part the Plaintiffs' motion, finding that Plaintiffs were seasonal workers within the meaning of the AWPA, but that the work performed by Plaintiffs did not constitute agricultural employment under the AWPA.

Plaintiffs then perfected this appeal regarding the second issue. Defendants did not file a brief or participate in oral argument on appeal.

## II. STANDARD OF REVIEW

Whether Plaintiffs' raking, gathering, baling, and loading of pine straw for commercial sale is "agricultural employment" within the purview of the AWPA is an issue of first impression in this court. Because the issue exclusively concerns a question of law, the court reviews it *de novo*. *Scala v. City of Winter Park*, 116 F.3d 1396, 1397 n.1, 1398 (11th Cir. 1997).

## III. ANALYSIS

Whether the raking, gathering, baling, and loading of pine straw constitutes "agricultural employment" within the purview of the AWPA requires us to consider several aspects of statutory interpretation. We first look to the text of the statute, considering principles of statutory construction and seeking guidance from the DOL. We also consider the act's purpose as indicated in the legislative

5

history.  Lastly, we consider case law.  *See Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1505 (11th Cir. 1993) (construing the AWPA).  "Our ultimate goal is to give effect to congressional intent."  *See id.* (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S. Ct. 1026, 1031, 103 L. Ed. 2d 290 (1989)).  The "AWPA is a remedial statute and should be construed broadly to effect its humanitarian purpose."  *Id.* (citing *Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271, 276 (5th Cir.), *cert. denied*, 488 U.S. 854, 109 S. Ct. 141, 102 L. Ed. 2d 113 (1988)).  After considering these aspects of statutory interpretation, we conclude that Plaintiffs were engaged in "agricultural employment" within the meaning of the AWPA.

*A.     Text of the AWPA*

The AWPA defines "agricultural employment" as

> employment in any service or activity included within the provisions of section 3(f) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(f)), or section 3121(g) of Title 26 [defining "agricultural labor" in the Internal Revenue Code] and the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state.

29 U.S.C. § 1802(3).  Thus, the AWPA encompasses three possible definitions for agricultural employment: (1) employment within the provisions of section 3(f) of the FLSA, 29 U.S.C. § 203(f); (2) employment within the provisions of section

6

3121(g) of the Internal Revenue Code ("IRC"), 26 U.S.C. § 3121(g); and (3) "the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state." *Id.*

In order to fall within the first two definitions of "agricultural employment," the work must be performed "on a farm." 29 U.S.C. § 203(f) ("'Agriculture' includes farming in all its branches . . . and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations . . . ."); 26 U.S.C. § 3121(g) ("'[A]gricultural labor' includes all services performed . . . on a farm, . . . in connection with raising or harvesting any agricultural or horticultural commodity . . . ."); *see also Bracamontes*, 840 F.2d at 272-73. Plaintiffs concede that their pine straw work does not fall within the FLSA definition because their work is not performed on a traditional farm, e.g., on land dedicated to the raising of crops or livestock. *See Bracamontes*, 840 F.2d at 272-73 ("farm" has been interpreted to include only traditional farms). Plaintiffs argue, however, that they fall within the IRC definition because the IRC includes "plantations" in its definition of a farm. 26 U.S.C. § 3121(g). While Plaintiffs refer to the land upon which the pine straw is gathered as a "plantation," whether such an area is indeed a "plantation" within

7

the meaning of the IRC is unclear from oral argument, the record, and the IRC. *See, e.g., Kaolin Mushroom Farms, Inc. v. United States*, No. 77-4379 (E.D. Pa. Sept. 21, 1979) (unpublished opinion) (recognizing that the IRC presents a "somewhat uncertain statutory framework" containing circular definitions of both "farm" and "agricultural commodity"). We need not resolve this issue, however, because we conclude that Plaintiffs fall within the AWPA's third definition of "agricultural employment."

Under the third definition, "agricultural employment" is the "handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in is unmanufactured state." 29 U.S.C. § 1802(3). Because Plaintiffs were clearly "handling" pine straw, the narrow issue in this case becomes whether pine straw is an "agricultural or horticultural commodity" within the purview of the AWPA.

The AWPA does not define "agricultural or horticultural commodity" or "agriculture." Because this case presents a close question and several interpretations are plausible, we carefully construe the statute, focusing first on the term "agriculture."

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common

meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S. Ct. 311, 314, 62 L. Ed. 2d 199 (1979). Webster's Dictionary defines "agriculture" broadly as "the science or art of the production of plants and animals useful to man and in varying degrees the preparation of the products for man's use and their disposal (as by marketing)." Webster's Third New International Dictionary 44 (1986); *see also* Black's Law Dictionary 69 (7th ed. 1999) (agriculture is "the science or art of cultivating soil, harvesting crops, and raising livestock"); 3 Am. Jur. 2d *Agriculture* § 1, at 768 (2002) (agriculture includes "preparing soil, planting seeds, raising and harvesting crops, . . . gardening, horticulture, viticulture, dairying, poultry, bee raising, ranching, riding stables, firewood operations, and landscape operations"). Likewise, the FLSA and the DOL define "agriculture" broadly to include forestry and lumbering operations performed on a farm. 29 U.S.C. § 203(f); 29 C.F.R. § 780.200 (1987) ("'[A]griculture' is sometimes used in a broad sense as including the science and art of cultivating forests . . . .").

Although the raking, gathering, baling, and loading of pine straw may fall within these broad definitions of "agriculture," the term "agricultural commodity" is ambiguous because it is unclear whether the term encompasses the pine straw at issue in this case. We therefore find it necessary to consider the purpose of the

9

statute to determine if Congress intended the terms "agriculture" and "agricultural commodity" to include the activities and commodity at issue.

## B.     *Purpose of the AWPA*

In 1983, Congress enacted the Migrant and Seasonal Agricultural Worker Protection Act "to remove the restraints on commerce caused by activities detrimental to migrant and seasonal agricultural workers . . . and to assure necessary protections for migrant and seasonal agricultural workers . . . ." 29 U.S.C. § 1801; *see also Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1207 (11th Cir. 2003).  The AWPA requires agricultural employers to register with the government; maintain employment records; and comply with various compensation, housing, and transportation provisions.[3]  *See* 29 U.S.C. §§ 1811-1844.  Anyone aggrieved as a result of an employer's failure to fulfill these responsibilities may bring a private right of action in a United States district court, for both legal and equitable relief.  29 U.S.C. § 1854(a), (c).

When determining to whom Congress intended the act to apply, we look to the AWPA's predecessor, the Farm Labor Contractor Registration Act of 1963,

---

[3] The AWPA defines "agricultural employer" as "any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker."  29 U.S.C. § 1802(2).

10

codified as amended at 7 U.S.C. § 2041 *et seq.* ("FLCRA") (repealed 1983). The FLCRA was the first major federal effort to improve the conditions for agricultural laborers, who are "among the most exploited groups in the American labor force," S. Rep. No. 93-1295, at 1-3 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6441, 6441-43, because they suffer chronic "low wages, long hours and poor working conditions." H.R. Rep. No. 97-885, at 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4547, 4547. Congress recognized that agricultural laborers are generally at the mercy of their employers as to the conditions and terms of their employment because of virtually insurmountable economic, social, educational, language, and cultural barriers. *Caro-Galvan*, 993 F.2d at 1505-06 (citing W. Gary Vause, *The Farm Labor Contractor Registration Act*, 11 Stetson L. Rev. 185, 198 (1982)).

In 1982, Congress substituted the AWPA for the FLCRA because the FLCRA had failed to aid exploited agricultural laborers, yet was hampering agricultural employers with its onerous registration requirements. *Id.*; H.R. Rep. No. 97-885, 1982 U.S.C.C.A.N. at 4549. To ease the burden on agricultural employers, the AWPA eliminated many of the registration requirements. The AWPA did not, however, narrow the class of workers entitled to protection against exploitation. *See Caro-Galvan*, 993 F.2d at 1505-06. Thus, the AWPA encompasses all activities covered by the FLCRA. *Id.*

11

The AWPA also expands coverage to include additional activities not previously protected by the FLCRA. *Bresgal v. Brock*, 843 F.2d 1163, 1168 (9th Cir. 1987). Congress' intent to expand the protections accorded to agricultural workers is evidenced by the purpose and text of the AWPA. The purpose of the AWPA was to provide "coverage to all aspects of commerce in agriculture." S. Rep. No. 93-1295, 1974 U.S.C.C.A.N. at 6448. These words "suggest a general broadening of the definition of agricultural employment." *Bresgal*, 843 F.2d at 1167. In addition, the amendment is entitled, in relevant part, "the ... Agricultural Worker Protection Act" whereas its predecessor was directed principally at "Farm Labor[ers]." Furthermore, the AWPA added the third definition of "agricultural employment," which applies to certain activities regardless of their location. Because the "handling . . . of any agricultural . . . commodity," if performed on a farm, is within the original definition of "agricultural employment," this third definition would be redundant if Congress had not intended to expand the protections afforded to agricultural workers beyond those working on farms. *Bracamontes*, 840 F.2d at 275-76; *Bresgal*, 843 F.2d at 1166-68 (stating that it is "inconceivable that Congress intended to protect workers planting fruit trees in an orchard, and to disregard workers planting fir trees on a hillside, when both groups suffer from the same clearly identified harm").

12

Accordingly, we conclude that Congress intended to expand the definition of "agriculture" and "agricultural employment" to include activities, regardless of their location, not previously covered by the FLCRA. We also conclude, for the reasons that follow, that this expanded definition of "agriculture" encompasses the raking, gathering, baling, and loading of pine straw in this case.

### C. Department of Labor Pronouncements

The DOL's pronouncements regarding the AWPA and related statutes support our conclusion. We accord significant weight to the statutory interpretation of the executive agency charged with implementing the statute being construed, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984); *Continental Can Co. v. Mellon*, 825 F.2d 308, 311 (11th Cir. 1987) (per curiam), particularly when a formally published regulation or opinion incorporates that interpretation, *see United States v. Mead Corp.*, 533 U.S. 218, 230-31, 121 S. Ct. 2164, 2172-73, 150 L. Ed. 2d 292 (holding that agency pronouncements are entitled to deference). While these administrative pronouncements do not have the force of binding law, we defer to them based on the expertise and experience of the agency. *See, e.g., Mabee v. White Plains Publ'g Co.*, 327 U.S. 178, 182, 66 S. Ct. 511, 513, 90 L. Ed. 607 (1946).

The DOL, in interpreting the narrower language of the FLSA, states that "'agricultural or horticultural commodities' refers to commodities resulting from the application of agricultural or horticultural techniques." 29 C.F.R. § 780.112 (2003). The DOL includes, *inter alia*, fruits and nuts from trees within this definition. *Id.* The DOL excludes, however, commodities produced by exploitation of natural resources or by uncultivated natural growth, such as peat moss. *Id.*; *see also id.* § 780.114 (excluding "wild commodities"). The DOL then limits this exclusion by stating that

> the fact that plants or other commodities *actually* cultivated by men
> are of a species which ordinarily grows wild without being cultivated
> does not preclude them from being classed as 'agricultural or
> horticultural commodities.' Transplanted branches which were cut
> from plants growing wild in the field or forest are included within the
> term.

*Id.* § 780.114 (emphasis added).

Based on these DOL pronouncements, we are persuaded that pine straw is an agricultural commodity so long as Plaintiffs used "agricultural techniques" to "cultivate" it. The district court's focus on the fact that no cultivation by man is *required* in order to produce pine straw was misguided. To the contrary, the question is whether *actual* cultivation occurred, not whether the cultivation was required to produce the naturally-occurring pine straw. *See id.* The district court

14

found that "the gathering of pine straw requires that underlying plants and debris be first cleared. Site preparation often requires the ground vegetation to be mowed mechanically by a 'bush hog,' and then the individual worker clears the area where he will be working [free] of loose branches and pine cones." [R. Vol. 1 at Tab 34]. The pine straw at issue in this case is therefore a "cultivated product" rather than a "wild commodity." Accordingly, it falls within the narrow definition of "agricultural or horticultural commodity" as used in the FLSA. As such, it also falls within the broader purview of the AWPA.

Furthermore, the DOL's Wage and Hour Administrator has issued an opinion letter consistent with our conclusion. The DOL issued the opinion letter in response to an inquiry regarding whether "agricultural employment" under the AWPA included "such activities as handling of wild, small plants growing in the forest, ... trimming and harvesting of evergreen boughs, harvesting of yew bark and harvesting of ferns." Wage-Hour Administrator Opinion Letter No. 1732 (WH-541), 1994 WL 975108 (Dec. 1, 1994). The DOL's position is that

> issues such as whether employees who work on forest products are subject to [the AWPA] are guided by the criteria delineated in the *Bresgal* decision. That decision makes it clear that Congress intended that agricultural employment include forestry operations of the type . . . described. Therefore, . . . [the AWPA] applies to all of the activities about which you inquired if done with predominately manual labor within a forest.

15

*Id.* Like the court in *Bresgal*, the DOL focuses on the nature of the commodities and their cultivation by man, rather than the location of the activities, in finding that the activities in question constituted agricultural employment. We too focus on the nature of the commodities and their manual cultivation and conclude that, because the pine straw was cultivated by man through a labor-intensive process, it constitutes an "agricultural commodity" that Plaintiffs handled during their "agricultural employment," as the AWPA defines both terms.[4]

### D.    Case Law

Our holding today is also fully consistent with other courts' decisions that have specifically analyzed the term "agricultural or horticultural commodity" as used in the AWPA. *See Bracamontes*, 840 F.2d at 276-77 (holding that pine tree seedlings are "agricultural or horticultural commodities" such that the planting of pine trees is "agricultural employment" under the AWPA);[5] *Bresgal*, 843 F.2d at

---

[4]We do not reach the broader question of whether the AWPA covers forestry workers as a whole because we conclude that Plaintiffs, regardless of whether they are forestry workers, were handling agricultural commodities. It should be noted that we have not previously addressed this question nor have we answered it. Interpretations of our decision in *Davis Forestry Corp. v. Smith*, 707 F.2d 1325, 1328 n.3 (11th Cir. 1983)(holding that competitor of alleged farm labor contractor did not have standing to sue under the AWPA), reasoning that such question was implicitly asked and answered, are misguided. *See, e.g., Bracamontes*, 840 F.2d at 274. To the contrary, we agree with the case law of other circuits, which shows that whether forestry workers are covered depends on whether they handle agricultural or horticultural commodities and whether their work involves labor-intensive cultivation of those commodities.

[5] The Fifth Circuit went on to hold that forestry operations, even when not performed on a traditional farm, were "agricultural employment" under the AWPA. *Bracamontes*, 840 F.2d at

16

1166 (holding that trees raised as a crop for harvest are agricultural commodities within the purview of the AWPA); *Colunga v. Young*, 722 F. Supp. 1479, 1486 (W.D. Mich. 1989) (finding that plaintiffs, who were migrant workers engaged in the cutting, gathering, tying, and loading of evergreen boughs, were "agricultural workers" within the meaning of the AWPA because "they were engaged in the handling of horticultural commodities"), *aff'd*, 914 F.2d 255 (6th Cir. 1990) (unpublished opinion); *Kaolin Mushroom Farms, Inc. v. United States*, No. 77-4379 (E.D. Pa. 1979) (unpublished opinion) (holding that mushroom compost is an agricultural commodity within the purview of the AWPA); *but see Donovan v. Frezzo Bros., Inc.*, 678 F.2d 1166, 1171 (3rd Cir. 1982) (holding that mushroom compost is not an agricultural commodity within the purview of the AWPA because it is produced by an industrial process, rather than an agricultural process, thereby making it a manufactured product).

In *United States v. Turner Turpentine Co.*, 111 F.2d 400, 404-05 (5th Cir. 1940),[6] the former Fifth Circuit concluded that the labor employed in the production of crude gum and oleoresin by the scarification of living pine trees was "agricultural labor" within the meaning of the term as used in the Social Security

276.

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207-09 (11th Cir.1981) (en banc), this court adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981.

Act.[7]  The court reasoned that, notwithstanding that the production of oleoresin in a tree is a natural process, because man can speed up and enhance the process through his labor, and because the oleoresin cannot be separated into turpentine and rosin, and thus put to commercial use, without human intervention, Congress intended the term "agricultural labor" to "have a meaning wide enough and broad enough to cover and embrace agricultural labor of any and every kind, as that term is understood in the various sections of the United States where the [Social Security Act] operates." *Turner Turpentine Co.*, 111 F.2d at 404-05.

We conclude that pine straw is analogous to those commodities previously deemed "agricultural or horticultural."  Like tree seedlings, trees, evergreen boughs, and mushroom compost, pine straw is produced by a natural process that can be – and was in this case – enhanced by manual labor and cannot be put to commercial use without human intervention.

---

[7] While the *Turner* court analyzed a different Act, the facts, analysis, and law are substantially similar so as to provide guidance in our interpretation of the AWPA.

18

## IV. CONCLUSION

Based on the plain language of the AWPA, its underlying Congressional intent, the DOL's pronouncements, and supportive case law from other jurisdictions, we conclude that pine straw is an "agricultural or horticultural commodity" such that Plaintiffs here were engaged in "agricultural employment." Therefore, they fall within the purview of the AWPA. Accordingly, we reverse the district court's judgment and remand this case for further proceedings consistent with this opinion.

REVERSED and REMANDED.