[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15081

_____

D.C. Docket No. 4:16-cv-00239-HLM

SHERITA LANGSTON,

Plaintiff - Appellant,

versus

LOOKOUT MOUNTAIN COMMUNITY SERVICES,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 5, 2019)

Before WILSON, JILL PRYOR and TALLMAN,[*] Circuit Judges.

PER CURIAM:

---

[*] Honorable Richard C. Tallman, United States Circuit Judge for the Ninth Circuit, sitting by designation.

An employee fired by a Georgia community service board, a public agency serving people with severe disabilities and addiction, sued her employer for failure to pay overtime wages under the Fair Labor Standards Act ("FLSA") and wrongful termination under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the FLSA. The district court granted summary judgment to the employer. After careful review and with the benefit of oral argument, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Defendant Lookout Mountain Community Services ("Lookout") provides mental health, addictive diseases, and developmental disabilities services in northwest Georgia. Lookout hired plaintiff Sherita Langston to be the House Manager for Flintstone, a home for a severely mentally and physically disabled resident. While Langston was employed by Lookout, Jan Lewis was Langston's supervisor, Janice Sabo was Lookout's Director of Human Resources, Michael Free was Lookout's Behavioral Health Director, and Tom Ford was Lookout's CEO.

Langston earned $26,000 per year based on a 40-hour work week; classified as exempt, she earned no overtime pay. Before the patient's arrival at Flintstone, Langston worked no more than 40 hours per week, but once the patient moved into Flintstone, Langston had to work longer hours, and she shared her discontent about the lack of overtime pay with her supervisor, Lewis.

2

As House Manager, Langston worked with employees known as instructors who earned $18,500 per year plus compensatory time off for hours exceeding 40 hours per week, except for the month Langston was fired, when they received overtime pay instead.  Langston's duties included:

- **Ensuring adequate staffing and supplies:**  Langston set schedules for the instructors and licensed practical nurses; ensured all shifts had enough people working; and reviewed time records submitted by instructors, signed off on them, and forwarded them to the proper department.  Around the clock, at least two staff—either two instructors or one instructor and one licensed practical nurse—were on duty at Flintstone.

- **Assigning staff to perform tasks:**  Langston directed staff to wake, dress, and feed the patient, help him use the bathroom and exercise, change the linens on his bed, purchase groceries for Flintstone, take out the garbage, and ensure that the patient was being fed according to a specific menu and at appropriate times.

- **Disciplining and evaluating staff:**  Langston disciplined staff, including sending Flintstone-wide e-mails warning staff not to:  smoke on the property, use Lookout's wifi on personal devices, consume food meant for the patient, and teach the patient to make derogatory comments.  She held at least one in-person meeting to order a staffer to work when scheduled and communicate respectfully with other staff and Langston.  Had Langston not been terminated five months into the job, she would have created for each member of the Flintstone staff performance management forms, which Lookout uses in its annual evaluation process to determine promotions and pay raises.

- **Promoting safety:**  Langston conducted drills required by Lookout's health and safety department.

- **Communicating with Lookout:** Langston participated in weekly conference calls with Lewis, Free, Ford, the Georgia Advocacy Office, the Regional Board Office, the Georgia Department of Behavioral Health and Developmental Disabilities, and the patient's mother to discuss the patient's

3

care.  Langston regularly e-mailed her supervisors regarding the patient's care and Flintstone activities.

- **Making recommendations on hiring:**  Langston interviewed job applicants for instructor and licensed practical nurse positions and made recommendations on whom to hire.  After Langston recommended that Lookout hire Pennie Callahan, Heather Saine, and Blake Winslett, Lookout offered them jobs, and Saine accepted.  After Langston recommended against hiring Sarah Carson for Flintstone because she lacked the medical experience needed to work independently, Lookout hired her to work not at Flintstone but at an outpatient clinic under direct supervision of experienced nurses.[1]

On a Friday evening, after learning that one of the staff, Kassondra McClure, could not work at Flintstone that weekend, Langston so informed Lewis over the phone.  Lewis told Langston, "[Y]ou'll have to work to cover it."  Doc. 59-3 at 15.[2]  The following Monday, Lewis e-mailed Free and Sabo to inform them that she had directed Langston to work at Flintstone the past weekend, but that when Lewis called Flintstone on Saturday morning, the staffer who answered the phone told her that Langston was not there.  Lewis closed her e-mail with "Want to let you know that Sherita did not appear to work over the weekend as I directed her to on Friday night."  Doc. 57-3 at 64.

---

[1] Langston recommended that Lookout hire Jennifer Cone, but the record sheds no light on whether Lookout acted on Langston's recommendation.

[2] "Doc. #" refers to the numbered entry on the district court's docket.

4

Lewis recommended to Sabo that Lookout fire Langston.  On Tuesday, Ford

met with Lewis, Free, and Sabo, at which time Ford, who was the ultimate decision

maker, decided to terminate Langston.  Ford testified as follows:

- Ford, Lewis, Free, and Sabo discussed how "the supervisor [Langston] did not follow a command by a manager [Lewis], which is insubordination in my sense.  She did not follow the command.  She did not work, and she pulled in another employee.  So Jan Lewis indicated she had told Sherita to work. Sherita did not work."  Doc. 62 at 149.

- When asked, "Would that have been fine if she [Langston] had brought in nursing staff?" Ford responded, "Yes, it would have been" and "[S]he had that authority.  She could have recommended that."  *Id.* at 151.

- Langston was terminated because of "[i]nsubordination" and "[f]ailure to adequately cover the site."  *Id.* at 153.[3]

- When asked, "[I]f she [Langston] says what she was told is [']someone's got to cover that,['] that's different than what you heard from Jan, correct?" Ford responded, "That's correct."  *Id.* at 175.  But when asked "What you were told?" [sic] Ford responded, "I was told by Jan that she [Langston] was told to work.  She did not work."  *Id.*

- When he decided to fire Langston, Ford knew that Langston had expressed discontent to Lewis about not receiving overtime pay.

Lookout fired Langston that Tuesday.  This was the first and only time she had

ever faced discipline while employed at Lookout.

Langston sued Lookout for failure to pay overtime wages in violation of the

FLSA and for retaliation for engaging in protected activity in violation of

---

[3] Ford also testified that Langston had been overworking the staff and putting the staff "at risk by working them that many hours."  Doc. 62 at 153.

42 U.S.C. § 1981, Title VII, and the FLSA.[4]  Lookout moved for summary judgment on all claims, and Langston moved for summary judgment on her FLSA retaliation claim.  The magistrate judge recommended granting Lookout's motion in full and denying Langston's motion.  The district court adopted the magistrate judge's recommendation and granted summary judgment to Lookout.  Langston appealed.

## II.    STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment. *Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990).

## III.    ANALYSIS

We affirm the grant of summary judgment to Lookout and the denial of Langston's partial motion for summary judgment.  Langston's § 1981 retaliation claim fails because she neglected to sue under § 1983.  Her Title VII retaliation claim fails because she neglected to satisfy the statutory prerequisite requiring her to obtain a right-to-sue letter from the U.S. Attorney General or demonstrate her entitlement to equitable waiver.  Her FLSA overtime compensation claim fails because she has raised no genuine dispute as to whether she was properly classified as an exempt employee not entitled to overtime pay.  Her FLSA retaliation claim

---

[4] Langston withdrew her § 1981 and Title VII race discrimination claims.

6

fails because there is no genuine dispute that Ford terminated her based on his

understanding that she was insubordinate.[5]

## A. Langston's § 1981 Retaliation Claim Fails Because Lookout Is a Government Agency That Must Be Sued Under § 1983.

In *Jett v. Dallas Independent School District*, the Supreme Court held that

42 U.S.C. § 1983 provides the exclusive damages remedy for violations of § 1981

by a local government actor; § 1981 creates rights but provides no independent

federal cause of action for a damages remedy when a government actor is the

alleged wrongdoer.  491 U.S. 701, 731, 733, 735 (1989).  Langston insists that

Lookout is not an agent of the State of Georgia based on the analytical framework

delineated in *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc), which is

used to determine whether a party is an "arm of the state" for purposes of Eleventh

Amendment immunity.  *Id.* at 1309.  Lookout does not, however, invoke Eleventh

Amendment immunity, so Langston's argument based on *Manders* is irrelevant to

determining whether *Jett* required her to sue under § 1983.[6]  As long as Lookout is

---

[5] Langston's argument that summary judgment violates the Seventh Amendment contradicts longstanding Supreme Court caselaw.  *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979) (noting that "summary judgment does not violate the Seventh Amendment" and citing *Fid. & Deposit Co. of Md. v. United States*, 187 U.S. 315, 319-20 (1902)).  We therefore summarily reject this argument.

[6] Langston's reliance on *Miller v. Advantage Behavioral Health Systems*, 677 F. App'x 556 (11th Cir. 2017) (unpublished), is also futile.  Setting aside that *Miller* is nonbinding, we note that it concerned whether community service boards were arms of the state for Eleventh Amendment immunity purposes; it contained no analysis of whether *Jett* requires community service boards to be sued under § 1983.  *Id.* at 558-59, 565.

7

a *government* actor—regardless of whether it acts on behalf of the State of Georgia or a political subdivision—Langston's failure to sue under § 1983 means that *Jett* bars her claim that her § 1981 rights were violated.[7]

We conclude that Lookout is a government actor.  Langston concedes that Lookout "is a Community Service Board."  Appellant's Initial Br. at 12.  Because the state legislature established community service boards as "public agencies," "instrumentalit[ies] of the state," O.C.G.A. § 37-2-6(a), and "public bod[ies]," *id.* § 37-2-6.3(a),[8] Lookout is a government actor.  A community service board loses

---

[7] Beyond *Jett*, damages suits against state-level actors face another barrier:  Because "a State is not a person within the meaning of § 1983," a plaintiff may not sue a state-level actor for damages under § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *see also Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 365 (1990) ("*Will* establishes that the State and arms of the State . . . are not subject to suit under § 1983 in either federal court or state court.").  A plaintiff may, however, seek injunctive relief against a state official in his or her official capacity.  *See Will*, 491 U.S. at 71 n.10 (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)).  Combined, *Will* and *Jett* constrained Langston's options:  either she needed to sue Lookout under § 1983 for violations of § 1981, or she needed to show that Lookout is a private actor, which would have permitted her to sue directly under § 1981.  She failed to comply with the first option because she neglected to sue under § 1983, and she cannot avail herself of the second option because she has raised no genuine dispute as to Lookout's status as a government actor.  Langston argues that she "has alleged from the very start that the [§ 1981] claim is brought against a 'private or independent employer,' thereby denying that [Lookout] is a 'government body' or a 'government entity,'" and quotes paragraph 34 of her original complaint.  Appellant's Reply Br. at 19 (alteration adopted).  At summary judgment, however, Langston may not rely on her pleadings to raise a genuine dispute as to Lookout's status as a government versus a private actor.  *See Rich v. Dollar*, 841 F.2d 1558, 1562 (11th Cir. 1988) ("Because this is an appeal of a [grant] of a motion for summary judgment[,] the plaintiff/appell[ant] cannot rely on the factual basis alleged in [her] complaint . . . to raise genuine issues of material fact.").

[8] Although another Georgia statute provides that community service boards are "public agencies in their own right" rather than "agencies of the state or any specific county or municipality," O.C.G.A. § 37-2-11.1(c)(1), the Supreme Court of Georgia has struck as unconstitutional this part of the statute "denominat[ing]" community service boards as "unclassified public entities" and held that community service boards are "unit[s] of State government."  *Youngblood v. Gwinnett Rockdale Newton Cmty. Serv. Bd.*, 545 S.E.2d 875, 877

8

its public agency status only if its local governing board, whose members are appointed by "the governing authorities of the counties within the community service board area," *id.* § 37-2-6(b), converts it to a "private nonprofit corporation" or a "component part of a hospital authority," *id.* § 37-2-6.4(a)(1), (3).  No record evidence points to Lookout's governing board having converted Lookout to one of those forms, so Lookout remains a government actor.  Having failed to sue under § 1983 to remedy her § 1981 rights, Langston may not proceed with her § 1981 claim; we affirm summary judgment to Lookout.

## B. Langston's Title VII Retaliation Claim Fails Because She Neglected to Obtain a Right-to-Sue Letter from the U.S. Attorney General.

When a putative plaintiff wishes to sue a "government, governmental agency, or political subdivision" under Title VII, § 706(f)(1) requires her to obtain a right-to-sue letter from the U.S. Attorney General.[9]  42 U.S.C. § 2000e-5(f)(1);

---

(Ga. 2001).  We need not decide whether, for purposes of § 1983, Lookout is a state- versus a local-level government actor because our analysis depends only on our conclusion that it is a government, not a private, body.

[9] An Equal Employment Opportunity Commission (EEOC) regulation says otherwise:  it provides that the EEOC will issue right-to-sue letters where it has dismissed a charge against a government, governmental agency, or political subdivision.  *See* 29 C.F.R. § 1601.28(d).  A D.C. Circuit opinion by then-Judge Ruth Bader Ginsburg pointed out that § 706(b) requires the EEOC to dismiss the charge and notify the aggrieved person if the EEOC lacks reasonable cause to believe the charge.  *Dougherty v. Barry*, 869 F.2d 605, 611 (D.C. Cir. 1989) (citing 42 U.S.C. § 2000e-5(b)).  Reading § 706(b) and § 706(f)(1) together, the D.C. Circuit held that § 706 requires the EEOC to issue right-to-sue letters where it finds no reasonable cause, including where the respondent is a governmental unit, and that the Attorney General must issue right-to-sue letters "only when the EEOC finds [reasonable] cause, conciliation efforts fail, and the EEOC refers the case to the Justice Department, but the Attorney General decides not to pursue

*see also Fouche v. Jekyll Island-State Park Auth.*, 713 F.2d 1518, 1524 (11th Cir. 1983); *Solomon v. Hardison*, 746 F.2d 699, 701 (11th Cir. 1984) (citing *Fouche*). This requirement is nonjurisdictional, however, and equitable waiver is available where the plaintiff "diligently attempted to obtain the required notice, but the Attorney General has refused to issue it," *Fouche*, 713 F.2d at 1526, or the plaintiff "conclusively demonstrated" that the Attorney General will not issue a right-to-sue letter because the Equal Employment Opportunity Commission (EEOC) has already issued one, *Solomon*, 746 F.2d at 702.

Langston received a right-to-sue letter from the EEOC but not the Attorney General.  She argues that she did not need to obtain a right-to-sue letter from the Attorney General because Lookout is not a state actor, ignoring that Lookout is nevertheless a government actor and hence qualifies as a "government, governmental agency, or political subdivision" under § 706(f)(1).  42 U.S.C. § 2000e-5(f)(1).  She makes no argument that she has diligently sought a letter to qualify her for equitable waiver under *Fouche* or *Solomon*.  We therefore affirm the grant of summary judgment to Lookout on Langston's Title VII retaliation claim.[10]

---

the action."  *Id.* at 611-12.  Our Court has not adopted the D.C. Circuit's interpretation of § 706(f)(1).

[10] The district court held, in the alternative, that Langston's Title VII retaliation claim fails because she abandoned it.  We need not address this alternative holding because we affirm based on the district court's decision on the merits.  *See Thomas v. Cooper Lighting, Inc.*,

**C. Langston's FLSA Claim for Overtime Pay Fails Because She Has Raised No Genuine Dispute as to Her Job Duties Supporting Her Classification as an Exempt Employee.**

The FLSA requires employees to receive compensation for hours worked in excess of 40 hours per week, 29 U.S.C. § 207(a)(1), but this requirement does not apply to an employee who works in a "bona fide executive . . . capacity," *id.* § 213(a)(1). Lookout bears the burden of "proving its executive exemption affirmative defense." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008). We accord *Chevron* deference to U.S. Department of Labor ("DOL") regulations interpreting this exemption. *See Pioch v. IBEX Eng'g Servs., Inc.*, 825 F.3d 1264, 1271 (11th Cir. 2016); *Morante-Navarro v. T&Y Pine Straw, Inc.*, 350 F.3d 1163, 1169 (11th Cir. 2003). "[A]pplying the executive exemption is an inherently fact-based inquiry that depends on the many details of the particular job duties and actual work performed by the employee seeking overtime pay." *Morgan*, 551 F.3d at 1263 (internal quotation marks omitted).

When Langston was fired, the DOL regulation interpreting the executive exemption contained four requirements: (1) the employee must receive at least $455 per week in compensation; (2) the employee's "primary duty" must be "management of the enterprise in which the employee is employed or of a

---

506 F.3d 1361, 1364 (11th Cir. 2007) ("We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.").

customarily recognized department or subdivision thereof"; (3) the employee "customarily and regularly directs the work of two or more other employees"; and (4) the employee has "authority to hire or fire other employees" or the employee's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a) (2015).[11]  Langston has raised no genuine dispute that her job met all four criteria and therefore was properly classified as exempt.

### 1.  Langston's Weekly Salary Exceeded $455 Per Week.

Langston concedes that she met this requirement.

### 2.  Langston's Primary Duty Involved Management of Flintstone, a Customarily Recognized Department or Subdivision of Lookout.

We work backward on this requirement.  Flintstone qualifies as a "customarily recognized department or subdivision of Lookout" because it has a "permanent status and function," *id.* § 541.103(a), as a residential home for a severely disabled patient.

As for "management," that term refers to:

---

[11] After Langston was fired, the DOL promulgated a new version of 29 C.F.R. § 541.100(a)(1), regarding the minimum salary requirement.  Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32,391, 32,549 (May 23, 2016) (codified at 29 C.F.R. § 541.100(a)(1)). The U.S. District Court for the Eastern District of Texas has held this new version to be invalid, *see Nevada v. U.S. Dep't of Labor*, 275 F. Supp. 3d 795, 807-08 (E.D. Tex. 2017), but its ruling has no effect on the version in place when Langston was fired and therefore no effect on our resolution of this appeal.

> interviewing . . . employees; setting and adjusting their . . . hours of work; directing the work of employees; . . . appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; . . . disciplining employees; planning the work; . . . determining the type of materials[] [and] supplies . . . to be used or merchandise to be bought . . . ; [and] providing for the safety and security of the employees or the property . . . .

*Id.* § 541.102.  Langston performed several management activities:  she interviewed job applicants; ensured all shifts were adequately staffed and set staff schedules; directed staff to perform various tasks to assist the patient and to keep the house functional; sent Flintstone-wide e-mails to staff ordering them to refrain from inappropriate behaviors; made lists of items she needed employees to buy for Flintstone; and conducted drills required by Lookout's health and safety department.  Had she not been terminated five months after she was hired, she would have created for each member of the Flintstone staff performance management forms that Lookout uses in its annual evaluation process to determine promotions and pay raises.

As for "primary duty," another DOL regulation provides:

> The term 'primary duty' means the principal, main, major or most important duty that the employee performs. . . . Factors to consider when determining the primary duty of an employee include . . . the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* § 541.700(a).  Langston's job met each of these factors.

13

**Relative importance of exempt duties.**  Langston fails to make an argument on this factor, so she has abandoned any dispute she might have about whether her job satisfied it.  Regardless, the record indicates that Langston's exempt duties were more important than her nonexempt duties.  Her exempt duties included:  ensuring that at least two staffers were always available to take care of the patient; directing staff on when to wake, dress, and feed the patient and help him use the bathroom and exercise; sending Flintstone-wide e-mails disciplining staff; holding at least one in-person meeting to scold a staff member about working when scheduled and communicating respectfully; and participating in weekly phone calls with Lookout senior leadership, Georgia state regulators, and the patient's mother regarding the patient's care.  As House Manager, she was the only person at Flintstone who performed those roles.  In contrast, her nonexempt duties were limited to preparing food for the patient, counting medication, and changing the patient's clothes—all of which she did only when the nonexempt staff were busy or needed help.

**Time spent on exempt work.**  The record contains sparse evidence on this factor.  A DOL regulation explains that "[g]enerally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work," whereas "the nonexempt employee generally is

14

directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods." *Id.* § 541.106(a). Langston testified that she helped prepare food for the patient only when the instructors were busy, would assist the nurses with counting medication only when they asked for help, and would change the patient's clothes only when needed. Langston repeatedly refers to Lewis's deposition statement that it was Langston's job to "take care of the resident," Doc. 59-3 at 37, but she takes that statement out of context. Lewis's complete statement was: "I believe that she understood the seriousness, if you will, of the responsibility that she and the other staff in the home had to take care of the resident." *Id.* Langston has created no genuine dispute as to this factor. She performed a wide range of exempt work as her usual practice and performed nonexempt work on her own initiative—without prompting from a supervisor—or when her staff requested help.

**Freedom from direct supervision.** The record is sparse on this factor as well. But given that Langston was free to assign staff to shifts as she thought necessary and was permitted to direct and discipline staff on her own initiative, she has created no triable issue as to this factor.

**Comparison of Langston's salary to nonexempt employees' wages.** Langston asserts that the instructors made nearly as much as she did for their non-exempt work. But her assertion is based on the unsupported assumption that

15

instructors worked an average of 10 overtime hours each week, year-round.  From timesheets showing that weekly overtime hours varied from two to 23 hours, depending on the staffer, in the two months preceding her termination, it is impossible to draw a reasonable inference that, on average, Flintstone instructors worked 10 overtime hours per week for the entire year.  Having failed to raise a genuine dispute as to this factor and the preceding components of the "primary duty" requirement, Langston has failed to create a genuine dispute as to the fact that her primary duty involved management of Flintstone.

### 3. Langston Regularly Directed the Work of at Least Two Employees.

At least two staff were always required to be on duty at Flintstone, and it was Langston's job to schedule their shifts; direct them on when to wake, dress, and feed the patient and help him use the bathroom; and issue reprimands about proper behavior.  She has created no triable issue on this requirement.

### 4. Langston's Recommendations as to Hiring Were Given Significant Weight.

According to another DOL regulation on hiring, firing, and promotions,

> [t]o determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include . . . whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. . . . An employee's suggestions and recommendations may still be deemed to have "particular weight" . . .

16

even if the employee does not have authority to make the ultimate decision as to the [other] employee's change in status.

29 C.F.R. § 541.105.  Langston's recommendations as to hiring were given "particular weight" under this definition.  *Id.*  After Langston recommended that Lookout hire Pennie Callahan, Heather Saine, and Blake Winslett, Lookout offered them jobs, and Saine accepted.  After Langston recommended against hiring Sarah Carson for Flintstone because she lacked the medical experience needed to work independently, Lookout hired her to work not at Flintstone but at an outpatient clinic under direct supervision of experienced nurses.  The outcome of her recommendation regarding Jennifer Cone is indeterminate from the record.[12]  For the outcomes that are determinate, Lookout followed Langston's recommendations 100% of the time.  Langston created no triable issue on this or any of the other requirements for the "bona fide executive" exemption to the FLSA's overtime compensation provision.  29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.100(a).  We therefore affirm the grant of summary judgment to Lookout on Langston's FLSA compensation claim.

**D. Langston's FLSA Retaliation Claim Fails Because She Raised No Genuine Dispute as to Lookout's Nonretaliatory Reason for Firing Her.**

To prevail on an FLSA retaliation claim, the plaintiff must establish a prima facie case, at which point the burden shifts to the employer to offer a nonretaliatory

---

[12] *See supra* note 1.

reason for the adverse action, after which the plaintiff must show that the employer's reason was pretextual. *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018). Even assuming that Langston has established a prima facie case, we conclude that her claim fails at the pretext stage because she has raised no genuine dispute as to Lookout's nonretaliatory explanation that she was fired for insubordination.[13]

Langston tries to exploit an ambiguity in Lewis's testimony—that Lewis told her on the Friday evening preceding her termination, "[Y]ou'll have to work to cover it." Doc. 59-3 at 15. She argues that Lewis's statement meant that she had to find a way to cover the shifts, and that she could fulfill this command *either* by working the shifts herself *or* by finding another staff member who could fill in. Because she found another staffer to work the shifts, Langston argues she was not insubordinate.

Langston disregards, however, that all that matters is decisionmaker Ford's understanding of the nature of Langston and Lewis's interaction. Ford testified he understood that Lewis had ordered Langston to work the shifts herself and that Langston had failed to show up. True, Ford also testified that Langston had the authority to direct other staffers to fill those shifts and that there was a difference

---

[13] The district court granted summary judgment to Lookout on the basis that Langston failed to establish a prima facie case. Under our right-for-any-reason rule, we may affirm based on any ground supported by the record. *See Thomas*, 506 F.3d at 1364.

18

between Langston saying, as paraphrased, that Lewis told her "someone's got to cover that" and what Lewis told Ford she told Langston.  Doc. 62 at 175.  But these statements do not conflict with his testimony that (1) his understanding was that Lewis had ordered Langston to work the shifts herself, (2) Langston had not done so, and (3) he viewed Langston's failure as insubordination.

Courts do not "second-guess the wisdom of an employer's business decisions . . . as long as those decisions were not made with a[n] [unlawful] motive.  That is true . . . no matter how mistaken the firm's managers." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (citation omitted) (internal quotation marks omitted).  Even if Langston's interpretation of Lewis's command was one a reasonable person would have made, even if Lewis and Ford mistakenly thought the scope of Lewis's order was narrower than how Langston reasonably interpreted it, and even if Langston had actually shown up to work that weekend but Lewis mistakenly believed she was absent, the analysis does not change.  Langston nowhere disputes that (1) Ford understood her to have violated Lewis's order, (2) Ford viewed the failure to follow a supervisor's order as insubordination, and (3) insubordination is a valid, nonretaliatory reason for firing someone.  Because Langston has failed to raise a genuine dispute as to

19

Ford's nonretaliatory reason for firing her, we affirm the grant of summary judgment to Lookout on her FLSA retaliation claim.[14]

## IV.    CONCLUSION

We **AFFIRM** the district court's grant of Lookout's motion for summary judgment and denial of Langston's partial motion for summary judgment.

**AFFIRMED.**

---

[14] Langston attempts to present Kassondra McClure as a comparator, arguing that McClure failed to work shifts scheduled at Flintstone and that the district court improperly excluded evidence regarding McClure. Langston fails to address the district court's adoption of the magistrate judge's finding that, at best, the record shows only that Langston was unaware of an arrangement McClure previously had worked out with Sabo, the Director of Human Resources, that released her from any obligation to work at Flintstone. Because McClure was not insubordinate, she is not a proper comparator.

20